GEORGE M. UPSHUR ET AL., THE BOARD OF POLICE COMMISSIONERS OF BALTIMORE CITY, *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*Police Force of Baltimore City—Right of Park Board to Require Policemen to be Detailed for Service in the Parks of the City—Control Over the Police Force—Construction of Statutes—Repugnancy—Statute Mandatory or Directory.*

Section 95 of the Act of 1898, ch. 123 (The amended charter of Baltimore City), directs the Board of Police Commissioners at the request of the Board of Park Commissioners to detail from time to time such of the regular police force of said city as the Board of Park Commissioners may deem necessary for the preservation of order within the parks and squares, which policemen shall be under the direction of the Park Board.  Section 758 of the local law relating to said city also requires the Police Board on the requisition of the Park Board to detail from time to time such number of the regular police force of said city as the said board may deem necessary for the preservation of order within the parks, which detailed force shall have the same power in the premises that the police of the city have as conservators of the peace.  But this section does not place the policemen so detailed under the direction of the Park Board as section 95 does.  Both of the above-mentioned statutes were originally enacted when the chief park was outside of the city limits, and so beyond ordinary city police control, and were retained in subsequent statutory revisions.  Since 1888 all the parks have been within the city limits.  Section 744 of the local law provides that the Police Board shall at all times within the boundaries of the city preserve the public peace, prevent crime, arrest offenders, etc.  Sec. 755 directs every police officer to report to the Police Board.  Under section 6 of said charter and section 759 of the local law the municipal authorities of Baltimore are prohibited from interfering with the police force which is placed under the exclusive control of the Police Board.  The

Board of Park Commissioners applied in the name of the Mayor and City Council for a *mandamus* directing the Police Commissioners to detail and place under the direction of the Park Board eighty-three men from the regular police force for the preservation of order in the parks of the city to serve all the year round, and six additional men to serve from May to October. *Held,*

1st. That even under said section 95 considered alone the prayer of the petition is not proper to be granted, since that section, according to its true construction, only authorizes the Park Board to require the Police Board to set apart occasionally, or now and then, patrolmen for a particular service, and it does not mean that the Police Board must detail the men permanently or for the definite period of a year as the petition asks

2nd. That under section 744, it is just as much the duty of the Police Board to preserve order in the parks as in the city, since the parks are now within the city limits ; and if section 95 be treated as mandatory then the municipal authorities would be authorized to interfere with the exclusive control of the police force vested by section 6 of the charter and sections 744 and 759 of the local law in the Police Board and the duty of that board to preserve order throughout the city, and since sec. 95, if treated as mandatory, would be in conflict with these other statutory provisions, the petitioner's right to a *mandamus* is not a clear, distinct, legal right which is the indispensable basis for such a writ.

3rd. That sections 95 and 758 when first adopted had relation to a different situation from the one which now exists ; and when they were put side by side with others which gave in mandatory terms such plenary power to the Police Commissioners throughout the whole city, including the parks, and which denied to the city in prohibitory words any control over the police, they must be treated as simply directory or explanatory, and not as creating exceptions to the broad powers of the Police Board.

4th. That the Park Commissioners are not entitled to demand a detail of policemen to serve in the parks, unless there is some occasion for it and a just relation between the occasion and the number of men demanded ; that the allegation of the petition in this case setting forth that the additional policemen asked for were necessary to preserve order in the parks was denied by the answer, and since there was no evidence adduced to establish this allegation of the petition, the writ should be refused for this reason as well as for the other reasons above set forth.

When the question is whether a statute which directs or authorizes a certain thing to be done is directory or mandatory, the mere words of the statute are not controlling. The whole surroundings, the purposes of the enactment, the ends to be accomplished, the consequences that may result from one meaning rather than from another, and the cardinal rule that seemingly incongruous provisions shall be made to harmonize rather than conflict, must all be considered in determining whether particular words shall have a mandatory or a directory effect ascribed to them.

Appeal from order of the Baltimore City Court (STOCK-BRIDGE, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Alonzo L. Miles*, for the appellants.

*Olin Bryan*, for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

This is an application for a writ of *mandamus*. The petition was filed in behalf of the Board of Park Commissioners, by and in the name of the Mayor and City Council of Baltimore, against the Board of Police Commissioners. The relief asked is that the Police Commissioners shall be required to detail, and place under the direction of the Board of Park Commissioners, eighty-three men from the regular force of patrolmen, for the preservation of order within the parks and squares of the city of Baltimore. This demand that the Police Commissioners shall separate and detach from the regular force under their command, about twelve per cent of the total number of policemen and place them under the control of the Park Board to render service in the parks and squares, is supposed to be sanctioned by *sec. 95, ch. 123, Acts of 1898.* That section, which is a part of the city charter, is in the following words: " The Board of Police Commissioners of Baltimore City is *directed* at the request of the Board of Park Commissioners to detail *from time to time* such of the regular police force of said city as the said Board of Park Commissioners may deem *necessary for the preservation of order within said parks and squares,* according to the regulations aforesaid, *which policemen shall be under the direction of said Board of Park Commissioners,* and shall have the *same power in said parks* and squares that the *police of the city of Baltimore* have *as conservators of the peace in Baltimore City* or elsewhere." If this section stood alone—if there were no other provisions of the local law bearing on the same subject—it might possibly

furnish a ground to support to some extent, but not in its entirety, the Park Commissioners' contention.    But there are other enactments forming part of the local law, and equally as important and obligatory as the one just read, and equally as applicable as it is to the subject-matter of this controversy. These will be alluded to in a moment, and then *sec. 95* will be interpreted, *first*, as it now stands, and *secondly*, in the light of other pertinent sections and in view of the circumstances that suggested and accompanied its adoption when originally enacted.

It may not be amiss to briefly restate a few fundamental and familiar principles which ought not be lost sight of in dealing with the question which this record presents.    It must be remembered that a writ of *mandamus* is not a writ of right granted as of course, but it is one which is allowed " only at the discretion of the Court to whom the application is made. This discretion will not be exercised in favor of applicants unless some *just* or *useful* purpose may be answered by the writ." *Booze* v. *Humbird*, 27 Md. 4.    It is also well settled that the relator's right which is sought to be enforced must be a clear, distinct *legal* right; *State ex rel., O'Neill* v. *Register et al.*, 59 Md. 287, and that it must be certain and free from doubt. *Mandamus* is an extraordinary process, " and if the *right be doubtful,* or the duty discretionary, or of a nature to require the exercise of judgment  *  *  *  this writ will not be granted.  *  *  *  * And it will not be allowed unless the Court is satisfied that it is necessary to secure the ends of justice."    *Georges Creek Co.* v. *Co. Coms.*, 59 Md. 259; *State, &c.,* v. *Latrobe*, 81 Md. 222.    The writ " is based upon reasons of justice and public policy to preserve peace, order and good government," *Poe's Pr.*, sec. 708, and obviously, therefore, will never be granted when those ends would be subverted or might be frustrated.    Bearing in mind these recognized axioms a farther examination of the provisions of the charter and the local law will now be made.

That which is now *sec. 95* of the charter has been transcribed, with some slight changes, from the *Act of 1862, ch.*

*29;* and that Act related very largely to the acquisition of land now forming Druid Hill Park. That land was then wholly beyond the city limits and entirely within the outlines of Baltimore County. *Sec. 758* of the local law declares: "The said Board of Police Commissioners are *required* on the requisition of the Board of Park Commissioners, to detail *from time to time* such number of the regular police force of said city as the said board may deem *necessary for the preservation of order within any parks* under their control, which *detailed* force *shall have the same power in the premises that the police force of the city have, as conservators of the peace."* This provision when originally adopted formed part of the *Act of 1867, ch. 367,* and was only applicable to Druid Hill Park which was still beyond the city limits. *Sec. 744* of the local law, taken almost literally from the *Act of 1860, ch. 7,* by which the Board of Police Commissioners was first created, provides in part: "The duties of the Board of Police Commissioners * * * shall be as follows: "They *shall* at all times of the day and night, *within the boundaries of the city of Baltimore,* as well on the water as on the land, *preserve the public peace, prevent crimes and arrest offenders, protect the rights of persons and property,* guard the public health, preserve order at primary meetings and elections, and at all public meetings and conventions and on all public occasions and *places,* &c." *Sec. 745,* as amended by the *Act of 1900, ch. 425,* declares: "The said Board of Police Commissioners are authorized and required immediately on entering on the duties of their office to appoint, enroll and employ a *permanent* police force *for the city of Baltimore,* which they shall arm and equip as they may judge necessary under such rules and regulations as *they* may from time to time prescribe," &c. *Sec. 755* is emphatic in providing that: "It shall be the duty of *every* officer of police and *every* policeman and detective, to *report* to the *board* and deliver to them all property seized or found by said officer, &c." In all of the aforegoing extracts and in others to be read later on the words upon which stress will be laid will be put in *italics. Sec. 6* of the *charter* and *sec. 759* of the *local law* will be quoted hereafter.

Can these various sections be made to harmonize in such a way as to clothe the Park Board appointed by the Mayor, with authority to make, and then enforce by *mandamus*, the demand which is the basis of this proceeding, without disregarding the words of *sec. 95*, and without stripping the Police Board of some of its powers and narrowing the limits of its prescribed duties ?   Before proceeding to answer this inquiry it is essential that the precise demand made should be clearly understood and accurately kept in mind.  The exact demand, in the language of the first paragraph of the petition, is, that the Police Board shall furnish to the Park Board "from the regular force of patrolmen, *eighty-three* men to render service *all the year round* and *six additional men* to serve from *May to October*, for the preservation of order within the parks and squares of the city of Baltimore, in conformity with the regulations of the Board of Park Commissioners, as authorized by sub-sec. 95 of the Acts of Assembly of 1898, ch. 123, known as the city charter."   And the prayer of the petition is for a writ of *mandamus* commanding the Police Board "to *comply* with the request of the said Board of Park Commissioners, *as in this petition recited.*"   There can be no mistake about the scope and significance of this demand.   It distinctly asks that eighty-three men be detached from the regular force and be placed under the direction of the Park Board "*to render service all the year round*" in the parks and squares.   Does *sec. 95* standing alone justify *that* demand ?   Does it, when construed with the other cited sections, confer such a clear, definite and distinct legal right upon the Park Board to make *that* demand, and such a correlative duty on the Police Board to comply therewith, as will be enforced by a writ of *mandamus?*

*First.* Sec. 95 standing alone gives no power to the Park Board to demand permanent control, or control *for a year* over any part of the regular force of policemen.   At most that section *directs* the Police Board "*to detail from time to time*" such of the regular police force, &c.   These words "to detail from time to time" are not technical words.   They are the words of common speech, and as such their interpretaton is

within the judicial knowledge, "and, therefore, matter of law." *Marvel* v. *Merritt*, 116 U. S. 12. The *Century Dictionary* defines the verb "detail" to mean "to set apart for a particular service," and the phrase "from time to time" to mean "occasionally;" and the *Universal Dictionary* defines "from time to time" to mean "at intervals, now and then." Giving to the language employed its accepted meaning, the section merely provides that the Park Board may request the Police Board to "set apart" "*occasionally*" or "*at intervals*" or "*now and then*," a certain number of patrolmen "for a particular service," and, therefore, it does *not* mean that the Police Board shall detail the men permanently, or for the definite *period of a year*. As the duty to be performed by the Police Board is only to detail men *occasionally*, that is, at *irregular intervals,* the imposition of *that* duty, thus limited, gives the Park Board no authority to demand that a designated number of the police shall be detailed for *a whole year* to serve in the parks and squares. Service for a whole year means *continuous* service; the statute means *occasional* service. This construction not only ascribes to the language of the section its natural meaning, but, as will be seen in a moment, is imperatively demanded if the autonomy of the Police Department is to be maintained.

*Secondly:* Section seven hundred and fifty-eight whilst *requiring* the Police Board to detail "from time to time," and, therefore, occasionally, some of the regular police force to preserve order in the parks, does *not* place the policemen when so detailed, under the direction of the Park Board, as *sec. 95* does. By which section are the policemen when detailed for service in the parks to be governed? As members of the force they are undoubtedly bound to obey the Police Board. If under *sec. 95* they are subject to the direction of the Park Board, and are placed there, detailed, set apart, *for a year*, as the prayer for *mandamus* asks, they must obey the Park Board during that year, although *sec. 755* makes it the imperative and unqualified duty of *every* policeman to report to the Police Board. If the men detailed—set apart—for the parks are under the direction of the Park Board, they can

not at the same time be also under the direction of the Police Board. That is obvious. Before the parks were brought into the city, the police assigned to the parks were placed under the direction of the Park Board because the Police Board had no jurisdiction *as conservators of the peace*, beyond the city limits. At that time it was impossible that a clash of authority between the two boards could occur. Now it is otherwise. But what is the utility of the detailed policeman reporting to the Police Board, if, after being assigned to service in the parks, he must take his orders from the Park Board? And how can he be under the direction of the Park Board unless he takes his orders from *that* board? Under *sec. 744* and *sec. 745*, as amended by the *Act of 1900, ch. 425*, the Police Board has absolute control over the permanent police force enrolled for the city of Baltimore; and the municipal authorities have no right to interfere with that control. For, as was said by this Court more than forty years ago, in *Mayor, &c.*, v. *State ex rel. Board of Police*, 15 Md. 455, when construing the *Act of 1860, ch. 7*, which first created the Board of Police Commissioners: "This law deprives the city authorities of all control over, or interference with, the police of the city, except as provided by the 19th sec. of the 4th Art. of the Constitution" of 1851—an exception, it may be added, which does not concern the pending controversy because it is no longer contained in the organic law. It was manifestly not the design of the Legislature when enacting the new city charter to create a conflict between these various sections and thereby to leave to the Park Board an opportunity or the ability, if it should so elect, to diminish the force under the control of the Police Board, if the former selected *sec. 95* to act under, when by selecting *sec. 758* the police would not be withdrawn from the supervision of the Police Department. Which section is to control? Are we to say that *sec. 95* shall have priority over *sec. 758*? That would be in the teeth of the decision in *Smith* v. *Co. School Com.*, 81 Md. 513, where it was held that when different sections of the same law conflict, the later one must prevail. Or, are

we to say that both sections standing together must limit the wide and comprehensive authority of the Police Board over the men enrolled by them for the preservation of order and the protection of persons and property throughout the *entire* city of Baltimore? Will any accurate answer to these questions reveal a clear, distinct, legal right in the Park Board, sufficiently definite, free from doubt and imperative, to justify the issuing of a writ of *mandamus;* the ultimate effect of which writ will be to subordinate the judgment of the Police Board to the judgment of the Park Board on the subject as to what number of policemen shall be detailed for the parks, though the Park Board as an agency of the city is strictly forbidden to interfere *in any way* with the Police Board, as will be shown later on when *sec. 6* of the charter and *sec. 759* of the local law are commented on? By treating *sec. 95* as mandatory a conflict of jurisdiction between the Park Board and the Police Board is made, not only possible, but highly probable. This case presents a conflict in concrete form. The parks are *now* within the city limits. They *now* form part of the territory over which the jurisdiction of the Police Board extends. Independently of *sec. 95* it is just as obligatory on the Police Board to maintain order, preserve the peace and protect property within the parks and squares, as it is to discharge the same duties in the heart of the inhabited portion of the city. "They *shall* at all times of the day and night, *within the boundaries of the city of Baltimore * * * preserve the public peace*, prevent crime and arrest offenders, protect the rights of persons and property * * * on all public occasions *and places,*" *sec. 744.* These are amongst the objects for which the Police Board was clothed with plenary power to enroll, to arm and to maintain the force which the statutes subject to the board's authority. If the board is to do these things effectively, it must be in a position to enforce a rigid discipline over its subordinates; and there can be neither efficiency nor discipline, much less celerity of action, when the authority to command is divided between two boards. If *sec. 95* is mandatory, *then every part of it is*

*mandatory*, and the men who are furnished, under it, to the Park Board to serve for a year in the parks, are *for that period of time*, subject to the direction, that is, the control, of the Park Board ; and if this be so, they are necessarily, for the same period, withdrawn from the control of the Police Board ; for the obvious reason that they cannot obey both boards if the orders they receive from one are in conflict with the orders received from the other. If twelve per cent of the enrolled force can be thus withdrawn from the control of the Police Department, why may not twenty or thirty per cent be likewise dealt with ? If that can be done, then the utter demoralization of the force will surely ensue. If *sec. 95* be given a mandatory meaning then the Police Board, so far as respects the preservation of order in the parks, must be goverened, not by its members' own sense of duty, not by the obligation of their oath of office and not by their own judg-ment, but by the wisdom or the behests of the Park Board.

Now, as under *sec. 744* it is the imperative duty of the Police Commissioners at all times of the day and night " *within the boundaries of the city* " and at " *all public  *  *  *  places* " to " preserve the public peace, prevent crime and arrest offend-ers ;" and as the parks and squares are public places and are now within the boundaries of the city ; it necessarily follows that the jurisdiction of the Police Commissioners includes and extends over those squares and parks, and that the officers and men placed in the squares and parks are, whilst there, under the control and subject to the direction of the Police Commissioners. If this be so—and it does not admit of a rea-sonable doubt—then there is a palpable conflict between *sec. 744* and the antecedent *sec. 95* in so far forth as the latter sec-tion purports to subject the detailed policemen to the direction of the Park Commissioners ; and if both sections are manda-tory it is obvious that both cannot prevail. A construction which produces such a repugnancy and which subordinates in any particular the Police Commissioners, who are State officers (*Altvater* v. *Mayor, &c.*, 31 Md. 462), to the domination of a mere municipal board, cannot be said to establish a clear, dis-

tinct legal right, *free from doubt;* especially in the face of the provisions of *sec. 759* which emphatically declares :. " *Nothing* in this sub-division of this Article *shall be so construed as to

    \*   \*   \*   \*   give the said Mayor and Council of Baltimore any control over said Board* [of Police Commissioners] or *any officer of police, policeman or detective appointed thereby.*"    Nor can the theory that *sec. 95* is mandatory be upheld against the explicit provisions of *sec. 6, sub-title Police Power,* which provides :  " *Nor shall the said city, or any officer or agent of the city, or of the Mayor thereof, in any manner impede,* obstruct, *hinder* or *interfere with* the said *Board of Police,* or *any officer,* agent or servant thereof or thereunder.*"    Both of these last cited sections are prohibitory.    No *mandamus* can be issued to enforce compliance with a demand which overrides or is at variance in any particular or to any extent, with these clear and emphatic prohibitions.    If *sec. 95* is mandatory, then the Police Board *is* subject to the control of the Park Board to the extent that the former is imperatively bound to comply with the request of the latter.    But the right to order such compliance is a right not only to control, but a right *to interfere* with the Police Board ; and *quoad* that right the Police Board becomes subordinate to the Park Board.    But that is precisely what *sec. 6* of the charter emphatically declares shall not be the case.    If *sec. 95* is followed *sec. 6* must be disregarded. *Sec. 758* bears to *sec. 759* exactly the same relation that *sec. 95* bears to *sec. 6.*    If *secs. 95 and 758* are mandatory, it cannot be denied that *secs. 6 and 759* are equally mandatory.    The result of treating all these four sections as mandatory is that *secs. 6 and 95* of the charter must neutralize each other; and *secs. 758 and 759* of the local law must also do the same thing. There would then be no statutory provision at all to abridge the broad powers conferred on the Police Board by *sec. 744,* and no law making the latter subservient to the Park Board in *any* particular.

. *Secs. 95 and 758* when first adopted had relation to a different situation from the one which now exists ; and when they were put side by side with others which gave in mandatory

terms such plenary power to the Police Commissioners through-
out the *whole* city, including the parks, and which denied to·
the city in prohibitory words *any control over the police,* they
must be treated as simply directory or explanatory, and not as
creating exceptions to the broad and imperative powers of the
Police Commissioners. A section of the Code—and all these
sections of the charter are sections of the *Local Code, Art. 4*—
may be considered in the light of the original Act from which
it was codified and with reference to the *times and circum-
stances* under which the law was passed. *Maurice* v. *Worden,*
52 Md. 294; *Hooper* v. *Creager,* 84 Md. 195. Both *sec. 95*
and *sec. 758,* as originally adopted, the one in 1862, the other
in 1867, had reference to Druid Hill Park, which, as previously
stated, was then part of the territory of Baltimore County and
which was not brought within the city limits until the annexa-
tion *Act of 1888, ch. 98,* went into effect. As the police of
Baltimore City had no authority to make arrests in any part
of the territory within the limits of Baltimore County, except
in the instances named in the *Act of 1860, ch. 7,* and now re-
iterated in *sec. 744,* but which instances do not refer to the
preservation of order in the parks, it was clearly necessary for
the Legislature to enact some provision for policing the parks
owned by the city, but lying beyond the city limits. ·It was
with that end in view, and with no other, that both *secs. 95 and
758* were at first adopted. The phraseology employed demon-
strates this. Both sections declare that the policemen detailed
for the parks should "have the same power in the premises
that the police force of the city have as conservators of the
peace." Had it not been for that or some similar legislation
the city police would have been without authority as conser-
vators of the peace in the parks lying beyond the city limits.
The original design and purpose of the legislation, then, was
not to make the policemen assigned to the parks, independent
of the Police Commissioners ; but the purpose and design was
to give the men so assigned a power which without that legis-
lation they would not have possessed. But when the parks
were brought within the city limits by the annexation Act the

reason and necessity for those two sections obviously ceased; because when the parks became part of the city the police had, without regard to those sections, just as much power *within* the parks as they had on Baltimore or Charles streets. Neither of those sections, though the one was transcribed into the new charter and the other into the local law, confers any power on the Police Commissioners or on the policemen, not given by *sec. 744;* and neither of them can be treated, because so transcribed, as restricting the provisions of *sec. 744* or as enlarging the authority of the Park Board in any way, unless *sec. 6 and sec. 759*, which deny to the city and therefore to all its agents, including the Park Board, any control over the police, be entirely eliminated.    If *secs. 95 and 758* are no longer necessary to give the police jurisdiction in the parks, because the parks are now within the city limits; and if those sections can confer on the Park Board no control over the police force without striking down *secs. 6 and 759*, it is not perceived how the mere fact that they have been copied into the new charter and into the local law, gives to them a mandatory effect, which will, if pushed to where it necessarily leads, seriously interfere with the management of the police force by the Police Commissioners.    The history of the origin of *secs. 95 and 758*, the purpose which induced their adoption many years ago and their existing association with other provisions, with which they must clash if they are treated as mandatory but with which they may stand in perfect accord if they are regarded as merely directory, would seem to require that they be held to be, not mandatory, but directory. They cannot be read as exceptions to the Police Commissioners' general powers unless they are construed to be mandatory; because those general powers are under *sec. 744*, themselves essentially mandatory, and mandatory powers like those can not be controlled or limited by a mere directory provision.    If *secs. 95 and 758* are treated as exceptions to *sec. 744*, they must, and can only be so treated because they *are* mandatory. Now, *sec. 95*, if mandatory, is in conflict with *sec. 6*, which is no less mandatory.    Both *secs. 6 and 95* are parts of the

·*charter.*   Giving to each a mandatory effect will .create a distinct conflict between two sections of. the charter. ' *Sec.: 758* .if mandatory is in conflict with *sec. 759:.* Neither of the latter ·is part of the charter, but both are included amongst the *local .laws.*   Giving to each a mandatory effect will create a distinct conflict between two .sections of the local law. Can such conflicts generate a clear,· definite, legal· right?   Every principle of interpretation,. in view of all the .surroundings, points to a directory construction of. *secs. 95 and 758.*   The unity of the charter ·and the consistency of the local. law will be maintained by holding those sections to be *directory.* The stability ·of the police force will be thereby guaranteed. The possibility of a clash of authority between two boards, with its serious consequences, will be thus· averted; and ·*secs. 6 and 759* will be respected and obeyed.       .       ·  .:       .      .   .

·   Nor must the circumstances which preceded and the occasion which prompted the. adoption of the Act of .Assembly creating the Board of Police. Commissioners be .overlooked when interpreting the city charter and the miscellaneous local laws to which·reference has been 'made.  For some years prior ·to the ·adoption of the *Act of 1860, ch. 7,* and, therefore, during a period when the police ·force was wholly under the con- ·trol of the municipality, the city authorities failed to suppress the disorder and lawlessness which prevailed to an alarming extent, and the riots and blood-shed which invariably accompanied a general or local election.  'The law was defied; the public peace was disturbed; the constabulary were powerless, if·not in sympathy with the mob, and .reputable citizens were driven. by violence from the polls.  Relief from the intolerable conditions which existed was finally sought by an appeal to the General Assembly, and the *Act of 1860, ch. 7,* completely separating the police department from the city government, was the result.   The Police Board was created and its members and the force enrolled by them were made State officers and the' city was denied, in the most positive manner, any right to interfere with or control the policemen.   *The under-* ·*lying purpose was to deprive the city of all power over the police.*

The change made Baltimore one of the most law-abiding communities in the country.   Can it be supposed that it was the design of the new charter to return, even partially, to the *status* which the *Act of 1860* abolished ?

The language of *sec. 95* must yield, if need be, to the *intent* of the whole enactment, *State* v. *Boyd*, 2 G. & J. 365; and that intent is perfectly obvious when the considerations already alluded to are given their just and appropriate weight. The words of *sec. 95* are simply directory as respects the detailing of policemen for the parks.   The Police Commissioners are "directed," and in *sec. 758* they are "required" to make the detail ; but neither of these words, in view of the whole context and the entire surroundings, creates an imperative, absolute duty, admitting of no discretion.   The last sentence of *sec. 29, Art. 3* of the Constitution, provides: "And whenever the General Assembly shall enact any Public General Law, not amendatory of any section, or article of the said Code, *it shall be the duty* of the General Assembly to enact the same, in articles and sections, in the same manner, as the Code is arranged."   This provision though containing the imperative word *shall* and though imposing an explicit *duty*, was held by this Court to be *directory*, and a law passed without the observance of that requirement was upheld.   *Co. Coms. v. Meekins*, 50 Md. 45.   It is not disputed that cases may be found where, owing to peculiar conditions, the word "direct" has been held to impose a mandatory duty.   Such, for instance, is the case *Mayor, &c., v. Reitz*, 50 Md. 574.   But mere words do not control.   The whole surroundings, the purposes of the enactment, the ends to be accomplished, the consequences that may result from one meaning rather than from another, and the cardinal rule that seemingly incongruous provisions shall be made to harmonize rather than conflict, (*New Lamp Ch. Co.* v. *Ansonia Co.*, 91 U. S. 656,) must all be considered in determining whether particular words shall have a mandatory or a directory effect ascribed to them.   It is peculiar, to say the least, that these two sections, *95* and *758* should *now* be mandatory, and should, therefore, to some extent deprive

the Police Commissioners of jurisdiction within the squares and parks and should curtail their authority in any way over the police force; though the primary object of these same sections at the time of their enactment was, *not* to curtail or restrict, but, on the contrary, to enlarge the jurisdiction of the Police Commissioners by permitting them to send conservators of the peace into the county, and to extend the authority of the city police so that they might preserve the peace and protect property beyond the limits of the city: From every point of view those two sections should be treated as only directory.

*Finally :* Laying aside all that has been said thus far, there is another view which is absolutely conclusive against the Board of Park Commissioners; and it is this. No one, it is believed, will venture to contend that *sec. 95,* however interpreted, confers, or was designed to confer, upon the Park Board an arbitrary and capricious power to demand that the Police Board should furnish for service in the parks, any number of policemen that the Park Board might, without adequate reason, ask for. Such a construction, if adopted, would put in the hands of a Park Board a dangerous power which could be used to seriously cripple the efficiency of the whole Police Department. There must, therefore, in the very nature of the situation, be some relation between the number of policemen demanded, the total number available for service throughout the city, and the occasion or needs for which the demand is made. In other words, there must be back of the demand a *neeessity* for the demand; and there can be, consequently, no valid demand without a real necessity to support it. For instance : The total police force is made up of seven hundred men outside of captains, lieutenants, and sergeants. *Act of 1900, ch. 425.* They are charged with the duty of policing the *whole* city covering about thirty-one square miles of territory including the parks. If the Park Board should require the Police Board to furnish *for a whole year,* and not for some special occasion or emergency, one-fourth of the entire force to guard the parks, which contain only about one and eight-

tenths square miles; such a demand would be manifestly un-
reasonable and unlawful.   It is clear, then, that there must
be some just and appropriate relation between the number of
men demanded and the occasion for the demand, to say noth-
ing of the ability of the Police Board to furnish such a num-
ber, due regard being had to the duty to police the rest of the
city.   It is certain, upon the most obvious principles, that no
Court would by *mandamus* enforce obedience to a demand if
in point of fact there existed no just ground for making the
demand.   This self-evident principle was recognized by the re-
lators in this case, and accordingly in the fifth paragraph of
the petition it is distinctly alleged that "the Board of Park
Commissioners * * *   are unable to properly preserve order
and the property of the city within the public parks and squares
of the city and protect the peace and safety of the citizens who
have access to said parks and squares, because of this failure
and refusal upon the part of the Board of Police Commissioners
to comply with the request of said Board of Park Commissioners
in reference to the necessary members of the police force for
the purposes hereinbefore stated."   This is clearly an allegation
of fact, and in substance it avers that the number of men de-
manded by the Park Commissioners is necessary for the pres-
ervation of peace and order and the protection of property
within the parks and squares.   Indeed, under the terms of
*sec. 95* it is only when such a necessity does exist that a de-
mand for policemen can be made at all.   The relators were
therefore required to make the averment contained in para-
graph five, or else, on the face of their petition, they would
have had no standing whatever in Court.   The allegation is
therefore a material one.   Now, the answer of the respondents
flatly denies that averment.   The denial is brief, but it is ex-
plicit.   It says, the respondents " deny the matters and things
alleged in the fifth paragraph of said petition."   The next
docket entry is: "Issues joined on petition and answer."
Here, then, is a distinct issue of fact, an issue of fact going to
the very root of the case, an affirmance on the one side and a
denial on the other that a necessity existed for supplying the

Board of Park Commissioners with those eighty-three police-men. Under *sec. 7, Art. 60 of the Code* of Public General Laws, the Court below had authority to determine that issue of fact provided *both* the relators and respondents agreed that it should. *Eichelberger* v. *Sifford*, 27 Md. 321. There is no such agreement in the record. Nevertheless, in the face of that condition, the Baltimore City Court, without hearing a word of testimony or a particle of evidence, ordered the per-emptory writ to issue. If in truth it had appeared at the hear-ing that there was no real necessity for supplying these eighty-three men and the additional six men, or forty-four policemen to the square mile whilst the balance of the city was left with but twenty-one to the square mile, can it be pretended that a writ of *mandamus* would have been ordered, merely because the Park Commissioners had made a demand for that number of patrolmen? The writ must not only serve some just and useful purpose, but it must be " necessary to secure the ends of justice ;" and if in fact there was no necessity, or what is the same thing if it did not appear that there was a necessity, for that number of men, no just or useful end could have been subserved and the ends of justice could not have been pro-moted by ordering the Police Commissioners to furnish them. How could the trial Court assume that the necessity existed in the teeth of the flat denial made in the answer? And yet before the writ could issue, the existence of the necessity must have been assumed, inasmuch as there was no evidence adduced to establish it. This Court must make the same assumption before the order appealed against can be affirmed. It is clear, then, laying aside all other reasons, that, because of this vital defect—this failure to establish the material allegations of the fifth paragraph of the petition—the writ should not have been issued.

A writ of *mandamus* must issue *as prayed* if it is issued at all. *Wells* v. *Com. Hyattsville*, 77 Md. 142. If the writ issues *as prayed* in this case, it will mean, when issued, that by an order of Court eighty-three men shall be detached from the Police Department and placed under the control of the city through

the Park Board, though this Court said in *15 Md.* the city had been deprived of *all* control over the police, and though *sec. 759* of the local law, transcribed from the *Act of 1860, ch. 7, sec. 19*, and continually in force for more than forty-two years, says precisely the same thing ; it will mean, when issued, that those eighty-three men shall be detached *for a whole year* from the Police Department, though the most the Park Board could require, under any view of *sec. 95*, is that the men should be detailed "from time to time" and, therefore, *occasionally*, and not for *continuous* service in the parks ; it will mean, when issued, that these eighty-three men shall be assigned to the parks for service *there* during a year, and consequently for service nowhere else, whereby the strength of the police force will be impaired to the extent of twelve per cent of its available number ; it will mean, when issued, that the material allegations of fact in the petition which have been flatly denied by the answer may be *assumed* to be true in the absence of any evidence to sustain them ; it will mean, when issued, that a divided and most likely a conflicting authority and control over the police will be established ; and it will mean that a prerogative writ which is a discretionary writ and should never be issued unless the relator's right is a clear, distinct, legal right, and unless the respondent's duty is definite and mandatory, may in Maryland, now and hereafter, be availed of where there is no such right or duty accorded or imposed, and where the ultimate effect may be the creation of discord in the government of a great city to the detriment of the public peace and tranquility.

*Order reversed and petition dismissed with costs.*

(Decided April 1st, 1902.)