WALTER E. LEE, Water Engineer of Baltimore City,
    and WALTER E. LEE, TELFAIR W. MARRIOTT,
    HARRY BUSICK, CHARLES W. JONES and R.
    LEE HEARN, Constituting the Water Board of
    the Municipal Corporation known as the Mayor
    and City Council of Baltimore,

*vs.*

JESSIE S. LEITCH and ESTELLE SNOW WILCOX.

*Mandamus: discretionary writ. Legislature and municipal cor-
    porations: delegation of powers; to boards or public offi-
    cers. Water Board of Baltimore City: care and pro-
    tection of newly paved streets. Police powers.*

Mandamus is an extraordinary process, and if the relator's
right be doubtful or the duty discretionary, or of a nature to
require the exercise of judgment, the writ will not be granted.
                                                              p. 40

The writ is not one to be accorded *ex debito justitiae.*   p. 40

The discretion will not be exercised in favor of applicants
unless some just and useful purpose may be answered by the
writ.                                                         p. 40

The Mayor and City Council of Baltimore have full and
complete control over the streets and highways of the city; this
power is a trust for the benefit of the public.              p. 41

The Mayor and City Council of Baltimore have the power to
create the Water Board, to operate and maintain a system of
water supply for Baltimore City, with power to make all rea-
sonable rules for the management of the same.*        pp. 41-42

In delegating these powers to the Water Board, the city does
not violate the principle, *"delegatus non potest delegare."* The
corporation in such matters may act through its officers and
agents.                                                       p. 46

The rule of the City of Baltimore and of the Water Board,
that newly improved streets shall not be torn up, in order to

---

*Sub-section 30 of section 6 of the Charter of Baltimore City
(see page 46 of Edition of 1915).

make connections with the water supply, unless a permit has first been obtained from the Highways Engineer, and approved by the Mayor, is a reasonable and constitutional exercise of implied police power, and of the express powers given by the City Charter. p. 46

While the Legislature may not delegate its power to. make laws, yet it may, expressly or by implication, delegate the police power to municipalities, to subordinate boards or commissions. p. 46

But the police power so delegated can never be *exclusive,* as the Legislature has no authority to divest itself of any of its sovereign functions or powers. p. 44

*Decided June 28th, 1917.*

Appeal from the Baltimore City Court. (DOBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*B. H. McKindless, Assistant City Solicitor,* (with whom was *S. S. Field, City Solicitor,* on the brief), for the appellants.

*Wm. Edgar Byrd* and *Charles Lee Merriken* (with whom was *Frank M. Merriken* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

The controlling facts of this case, briefly stated, are these: The appellees, Jessie S. Leitch and Estelle Snow Wilcox, are the owners of a lot of ground on Liberty Heights avenue, in Baltimore City, located 185 feet west of Carsdale avenue. They acquired title to this lot by a deed from the Forest Park Company of Baltimore City, dated February 7, 1916. The deed contained a description of the property conveyed and in it the following clause appears:

"That all right, title and interest in and to the avenues, streets, roads, lanes, sidewalks, alleys or paths

as the same are laid out and shown on the plat of the
company's property filed among the Land Records of
Baltimore City in Liber S. C. L. No. 2888, folio 608,
and which may constitute one or more of the line or
lines of the lot hereby intended to be conveyed, are
hereby expressly reserved by the company, its suc-
cessors and assigns, subject, nevertheless, to a right of
way to the said grantees, the survivor thereof, their
assigns, and the heirs and assigns of the survivor, over
and upon the said avenues, streets, roads, lanes, side-
walks, alleys or paths until the same shall be con-
demned for public use; and that all references to or
mention of avenues, streets, roads, lanes, sidewalks,
alleys or paths in this deed will be and are for the pur-
pose of description only, and not for the purpose of
dedication."

One of the alleys referred to in the deed is in the rear of
the appellees' property, and runs to Carsdale avenue, which
is a macadam street. This alley according to the understand-
ing of Henry W. Webb, the vice-president of the Forest Park
Company, and who had charge of the active management of
the affairs of the company, was laid out to serve the houses
fronting on Liberty Heights avenue. Liberty Heights ave-
nue was paved by the State Roads Commission, and turned
over to and accepted by the city in April, 1915. Robert M.
Cooksey, the Highways Engineer of Baltimore City, said the
pavement of Liberty Heights avenue is what is called "sheet
asphalt, vitrified brick street, that is sheet asphalt on the out-
ward portions, outside of the tracks and then vitrified brick
in the railway area, and the vitrified brick covers that portion
from outer rail to outer rail and the dummy space is vitrified
brick." It is a high class pavement, and the avenue had been
in the control of the city about 18 months before the com-
mencement of this suit.

Section 37, Article 91 of the Code, provides that: "No
opening shall be made in any such highway, nor shall any
structure be placed thereon, nor shall any structure which

has been placed thereon be changed or renewed, except in accordance with a permit from the commission, which shall exercise complete control over such highways, except as herein otherwise provided. No State highway shall be dug up for laying or placing pipes, sewers, poles, wires or railways, or for other purposes, and no trees shall be planted or removed or obstruction placed thereon without the written permit of the State Roads Commission, or its duly authorized agent, and then only in accordance with the regulations of said commission; and the work shall be done under the supervision and to the satisfaction of said commission." An opening was made in Liberty Heights avenue in 1914, while the avenue was under the jurisdiction of the State Roads Commission, in order to instal water in the house of Jesse Hamburger, which adjoins the property of the appellees. The precise circumstances under which this was permitted do not appear, but we will assume it was done with the assent of the State Roads Commission.

The city water main is located in the bed of Liberty Heights avenue at a distance of about 7 feet from the curb, and at the time the appellees purchased their property they were assured by an agent of the Forest Park Company that water connection had been made with the city main to the curb line. No such representation to this effect was made by any official or employee of the city, and such representation made to the appellees was unknown to the city. The appellees made no investigation, or inquiry to ascertain the truth of the representation. Its falsity could have been readily discovered by a simple inquiry of the Water Board. The appellees began the erection of a dwelling house upon the lot, and it was then discovered that the water connection had not been made. They applied for a permit to make the connection with the main in the bed of Liberty Heights avenue. The installation involved the opening or cutting of this recently laid, high class pavement, and the city authorities declined to grant the permit. The ground of their refusal is stated in two letters of Mayor Preston to Mr. Charles Lee

Merriken, attorney for the appellees, dated respectively, August 19th and September 20th, 1916, and in the testimony of the Mayor and that of Mr. Cooksey, the Highways Engineer. Mayor Preston had been fully advised by Mr. Merriken as to the facts attending the application for the permit, and in his letter of August 19th said:

"I have your letter of August 18th. I really am placed in a very embarrassing position about this case, and a good many other similar ones. I have to make a definite statement to the public and property owners, and am compelled to live up to it. I have no doubt that the water can be gotten in the back way of the property of Mrs. Jessie S. Leitch, on the north side of Liberty Heights avenue, a block and a half west of Garrison avenue, at perhaps additional cost, but do not see how we can cut the improved paving there at this time. I have uniformly declined to do this in hundreds of cases. Perhaps, if you take the matter up with Mr. Lee, Water Engineer, or the Construction Division of the Water Department, some way can be found whereby the water can be gotten into the house from the rear."

On August 29th, Mr. Merriken replied stating that it would cost $200.00 to introduce the water through the alley in the rear of the appellees' property, and again urged the granting of the permit. In reply to this the Mayor wrote as follows on September 20th:

"I have your letter of September 19th. I have no doubt that the Water Department will permit Mrs. Leitch to tap the supply pipe of her neighbor. I can see no objection to this plan, provided she pay the usual water charges. The tunnelling suggested by you would involve opening the street at the main. I regret to have to stand to our guns on these matters, but I have made no exception in any case. Of course, where there has been injury to the surface of the street, breaks in the mains, where sewer lines have to be opened, repairs have to be made, and in these cases water is

allowed to be introduced, because it does not involve
the independent cutting of the streets. I have not
allowed any exception to be made to this rule, and if
it has been done it is in violation of my orders."

On September 23, 1916, the Water Engineer, Mr. Lee,
wrote to Mr. Merriken that:

"The only way in which the supply can be brought
into Mrs. Leitch's new house, without disturbing the
improved paving in Liberty Heights avenue, is by
laying a service pipe in the alley north of Liberty
Heights avenue, from Carsdale to a point on the east
side of her lot."

In his testimony the Mayor said: "There is always a con-
stant resistance on our part to destroying pavements that have
been newly put down, except in cases where there seems to
be a necessity for it, where there has been a break under the
pavement, where the gas mains or sewers are broken under
the paving, and they have to go into them to repair them;
but we try not to do it if there is any possible remedy, any
possible relief, any possible way by which it can be avoided.
We found out that this could be avoided by a little addi-
tional expense on the part of the property owners; and we
refused, in common with all other similar cases, that come
under my direction, to.cut the improved paving. There is a
constant battle to prevent property owners from cutting the
improved paving; and if they see any improved paving go
down in front of their property, without any regard for pub-
lic interests, in practically a week or a day afterwards they
come in and want to enlarge the water pipe, or put in sewer
connections, or water connections, so it is a constant battle
to prevent the paving from being cut; and this is one of the
hundreds of cases that we have to decline. The objection is,
in the first place, what it should cost, and in the second place,
is getting the back fill so the pavement will stand up after it
is repaired. Sometimes we have to repair it once or twice
or two or three times. The tendency is that the back fill
sinks under the pavement, and then it goes down, and, of

course, the other thing is that, while you may be able to repair it very well, yet, at the same time, it is not a good thing to put down a new pavement and then go and cut it up again. On Baltimore street you would be surprised at the attitude of the community on the subject. I have letters constantly calling my attention to the fact that the new pavement has been put down on Calvert street, and a new cut was put in there. * * * Baltimore street has been repaved, a new street put down on Baltimore street, and yet there have been fifty cuts on Baltimore street on account of the defective back fill. The structures under the street go down with the back fill, the sewer and the water pipes, and electric conduit, for example. Now, then, you go down and cut down to repair a water pipe, and the fill goes in as well as you can make it, as well as you can practically make it, and the back fill goes down and carries with it the structures on the side, no matter how well you make it. In other cities they drill, or make a small hole in the middle of the pavement, and drill in. Well, we have not been able to do that very successfully, for the reason that our streets are so full of pipes that have been put down under various grants of the Legislature, gas pipes generally, and then bought out by the Consolidated, and such things, so we can not drill very well, I mean drill from the side, horizontally, but we have one constant battle. The applications for cuts in improved pavements come over my desk with what is known as a red flag, with a red piece of paper attached, showing that they are cuts in improved pavings, so that we can examine those cuts promptly and classify them as far as we can. Where we have old pavements, we are not so careful about it, macadam, old macadam paving, or old cobble, that does not come up at all; it is the improved, expensive pavement that has been put down by the property owners where we resist the cutting process wherever we can and exercise the best discretion we have in the public interests.

"I receive a great many applications for installing pipes to the curb line and I constantly refuse to grant these permits.

"Sometimes the circumstances or equities in the case seem to direct a different discretion. For instance, if the pavement is five or six or seven years old, if the pavement is already cut at that point for any purpose; suppose, for instance, there is a broken main there, and the property owner wants to go down into the same cut, we let them go. It is already there. There are a good many parallel cases that control the exercise of discretion. Mr. Hubert passed on some of them, in order to take the volume of business, and I do generally. For the first four years I think I took charge, and now Mr. Hubert is passing on them very largely in my office in my absence.

"I have never, so far as I can recall, none that I know of, granted any permits for opening improved paving where the circumstances were such as are present in this case. Other than the reasons which I have stated, I can only say: I am down there at the City Hall trying to protect the city's property as best I can and exercising the best discretion I can in the matter."

Mr. Cooksey said: "The reasons which operate would cause me to believe that it was proper to refuse this application. They are that I was under the impression that when the application was first presented the lot had just been sold by the company or parties developing that part of the city, and I knew, or thought I knew, they were well acquainted with our regulations regarding the tearing up of pavements, and I thought they should have made it their business to see that all their vacant lots which they proposed to improve were properly connected up before the new paving was laid. There has been a good deal of new paving laid in that territory. The company I am speaking of is the Forest Park Company, which sold to Mrs. Leitch. I also considered the reasons that apply to all permits for cutting new pavements, the fact that you can not very well at any reasonable cost repair a pavement so that it will be as good as before it was cut. It is practically impossible to join the asphalt around the edges of the cut. Every effort is made to make a bond, but it does

not actually bond. The concrete does not bond to the old concrete base, and I think we all know that it is pretty hard to ram any trench so that there will be no settlement. It may stand up a year and it may stand up a year and a half, but it generally settles some, which means a depression, and which means going back and spending the city's money again to bring that cut up to grade. Then, of course, we can not always get a plant to handle the cut immediately, and therefore we have got a hole which must be taken care of temporarily; in other words, it is temporary; and that permits moisture to enter and often makes it dangerous. * * * In other words, there is always a line in there between the old and new paving; a line between the material that goes in to make the patch in the original paving. This permits moisture to get in under the patch. There are times, of course, when that will seal over, but when the seal on the top is broken there is no bond all the way down, and if moisture gets in there in cold weather it immediately begins to lift the edge of the patch and it starts to disintegrate, the result of which is more work on that patch and unsatisfactory results in the end. That is, you can not make a patch as good as the original paving and you have holes or depressions. Considering these things led to the general policy that we should make as few cuts in the paving as possible and this is the general policy of the Highways Engineer's office, so much so that I continually advise other departments to explain the necessity before we will grant them permits for their own extension and repair work." The witness further testified that his department turns down probably three to five hundred applications a year for tearing up the new pavements, and the applications of the city departments are turned down for the same reason.

"Some of the applications for tearing up improved paving are granted, but the applications which are granted are under some of the following classes: Water leaks are granted, of course. Generally an emergency is given and an emergency break is given prompt attention, because if the water leak is

not repaired it will damage a greater and larger area of the street and the quicker it can be repaired the less damage will be done. A gas leak will always affect the asphalt in the same manner. It seeps up and the paving will disintegrate from escaping gas. The extension or enlarging of a water service in the downtown sections where sprinkler service is install'ed for fire protection. This is granted for fire protection. The extension of the water system, that is, a main connection, or an extension of the main of the water department for better service, but they are looked into quite well before they are granted.

"Q. Now, for merely curb line connections, that is, connections from the main line to the curb line, do you or not grant those? A. We do not, unless it is a case of the connection becoming worn out or breaking. Practically a leak or a choked connection. Q. But I am speaking of absolutely new connections? A. We do not grant those. Q. Now, we have been speaking of newly laid paving. Is there any period of time which you have fixed in your judgment when that no longer applies? A. After five years."

The city was willing to permit the introduction of the water from Carsdale avenue by the rear alley mentioned, or to allow the appellees to connect with the supply pipe of Mr. Hamburger, but refused, for the reasons stated, to cut the pavement on Liberty Heights avenue. It does not appear that the Forest Park Company had any objection to the introduction of the water through the rear alley, and in view of the testimony of Mr. Webb and the representation of their agent made to the appellees at the time of their purchase that the water connection had been made, it is hardly likely it would have objected So far as we are informed by the record the real reason why the appellees did not secure the water in that way was because of the additional cost. Failing to obtain the permit applied for the appellees filed a petition in the Baltimore City Court for a writ of mandamus, and that Court, after hearing the testimony, by an order dated January 22, 1917, ordered the writ of manda-

mus to issue against the appellants, "constituting the Water Board of the Municipal Corporation, known as the Mayor and City Council of Baltimore, commanding them to proceed forthwith with the installation of water from the water main of the Mayor and City Council of Baltimore, located in the bed of Liberty Heights avenue to the curb line in front of the property of the petitioners." This appeal was taken from that order.

The single question is: Had the Court the right, under the facts and circumstances stated, to compel the Water Board by mandamus to install the water as directed by the order appealed from? In dealing with this question it is important to keep in mind some fundamental principles governing the issuance of the writ of mandamus. It was said in *Upshur* v. *Baltimore City,* 94 Md. 743, that: "It must be remembered that a writ of mandamus is not a writ of right granted as of course, but it is one which is allowed 'only at the discretion of the Court to whom the application is made. This discretion will not be exercised in favor of applicants unless some *just* or *useful* purpose may be answered by the writ.' *Booze* v. *Humbird,* 27 Md. 4. It is also well settled that the relator's right which is sought to be enforced must be a clear, distinct *legal* right; *State ex rel., O'Neill* v. *Register et al.,* 59 Md. 287, and that it must be certain and free from doubt. *Mandamus* is an extraordinary process, 'and if the *right be doubtful,* or the duty discretionary, or of a nature to require the exercise of judgment * * * this writ will not be granted.' " And in *Brown* v. *Bragunier,* 79 Md. 234, it was said: "The remedy by *mandamus* is not one which is accorded *ex debito justitiae.* The writ is a prerogative one; and unless the right which the relator seeks to enforce is clear and unequivocal, and the correlative duty which the respondent refuses to perform is purely ministerial, and there be no other adequate remedy at law, it will not be granted."

Rights and duties are correlative, and unless there was a duty or obligation upon the Water Board to have installed the water as ordered, the appellees were not entitled under

the authorities cited to the writ of mandamus. To know what its duty was under the circumstances, it is necessary to examine certain provisions of the charter and ordinances of the city which relate to this subject. The installation of the water, which the appellants were directed to make, involved the opening or disturbance of the surface of a newly paved street. If the appellees have a right to require the opening of a pavement, others similarly situated must be accorded the same right, and the policy adopted by the Mayor for the preservation of newly laid pavements will be set aside, and the resulting injury described in the testimony, which that policy was designed to prevent, will inevitably ensue. It is well settled that the Mayor and City Council of Baltimore have full and complete control over the streets and highways of the city. "This legislative authority over the streets is sometimes classified as belonging to the police power; that is to say, that great power which embraces the protection of life, limb, health and property, and the promotion of the public peace and safety. It is a high conservative power of the utmost importance to the existence of good government." *Lake Roland Elevated R. R. Co* v. *Baltimore,* 77 Md. 352. The power to maintain and regulate the use of the streets is a trust for the benefit of the general public. This power in express terms is conferred by the charter upon the city. By *sub-section* 26-H,* the power is given to the city "to regulate the opening of street surface, for the purposes authorized by law or ordinance." The power to control and supervise the streets and highways of the city is comprehended in the grant of police power to the municipality. By *sub-section* 18 *of section* 6 of the Charter (Act of 1898, Ch. 123),† it has the power "to pass ordinances for preserving order, and securing property and persons from violence, danger and destruction, protecting the public and city property, rights and privileges from waste

---

*See 1915 Revised Edition Baltimore City Charter, p. 25.

†*Ibid.* p. 39.

or encroachment, and for promoting the great interest and
insuring the good government of the city.   To have and
exercise within the limits of the City of Baltimore all the
power commonly known as the Police Power to the same
extent as the State has or could exercise said power within
said limits"; and by section 31 of section 6 it is further pro-
vided that: "The foregoing or other enumeration of powers
in this article shall not be held to limit the power of the
Mayor and City Council of Baltimore, in addition thereto to
pass all ordinances not inconsistent with the provisions of
this Article or the laws of the State as may be proper in
executing any of the powers, either express or implied,
enumerated in this section and elsewhere in this Article, as
well as such ordinances as it may deem expedient in main-
taining the peace, good government, health and welfare of
the City of Baltimore; and it may provide for the enforce-
ment of all such ordinances by such penalties and imprison-
ments as may be prescribed by ordinance; but no fine shall
exceed five hundred dollars, nor imprisonment exceed twelve
months for any offense."

In *Rossberg* v. *State,* 111 Md. 394, JUDGE PEARCE, in dis-
cussing the Police Power of the city, said: "Broader or
more comprehensive police powers could not be conferred
under any general grant of police power, for the purpose
mentioned in section 18, than those granted in that section,
and when we consider the 'Welfare Clause' of the charter,
sec. 31,* greater emphasis could not be laid upon the implied
powers of the city for the maintenance of the peace, good
government, health and welfare of the city, than is there
laid.   That section expressly declares that, no enumeration
of powers in that article shall be deemed to limit the power
of the city, in addition thereto, to pass all ordinances, not
inconsistent with the article, or the laws of the State, as may
be proper in executing any of the enumerated powers, express

---

*Sub-section 31 of section 6 (see page 52 of Revised Edition
of Baltimore City, 1915.)

or implied, contained anywhere in said article. * * * In the present case, the legislative grant is not merely one of power to pass ordinances relating to specified police powers, regarded as a part only of the general police power, but the grant is of 'all the power commonly known as the Police Power, to the same extent as the State has or could exercise said power within said limits.' The implication therefore is a necessary one, that notwithstanding the preceding clause of that section of the charter enumerated certain purposes for which ordinances might be passed,—the Legislature intended the city to have, in addition, the power to pass ordinances for any and all purposes relating to the exercise of the police power. If therefore the power to pass the ordinance in question can be considered as an implied power, it is well within the definition of an implied power given by Judge Cooley, since the whole police power can not be exercised if the exercise of any part of such power is to be withheld because such part is not expressly granted. But we regard the power here in question as an express power, and this is so whether we look, in the construction of the charter, either to one or both of the sections heretofore reproduced. The grant of all the police power is an express grant, and every part of the whole is therefore derived by express grant in section 18. If there could be any doubt of this, such doubt is set at rest by section 31, which, as we have said, expressly declares that the power to pass any ordinance not inconsistent with that article or with the laws of the State, shall not be limited by any enumeration of powers, anywhere in said article. We regard the legislative intent therefore to be clear, whether the power be viewed either as express or implied. We did not understand the appellant to deny that this power can be delegated by the State to a municipal corporation. It is true as a general proposition that the Legislature can not delegate its power to make laws, but as expressed in 28 *Cyc.* 683: 'After repeated challenge of municipal authority to exercise the police power, on the ground that it is a sovereign power, and therefore nondeleg-

44 LEE *vs.* LEITCH.

able, the doctrine is firmly established and now well recognized that the Legislature may expressly or by implication delegate to municipal corporations the lawful exercise of police power within their boundaries. * * * It may be full or partial, regular or summary; but it is never exclusive, as the Legislature has no authority to divest itself of any of its sovereign functions or powers."

By sub-section 30* of section 6 of the Charter the Mayor and City Council was empowered: "To establish, operate, maintain and control a system of water supply for Baltimore City, and to pass all ordinances necessary in the premises," and it was further invested with "all rights and powers necessary for the introduction of water into said city, and to enact and pass all ordinances from time to time, which may be deemed necessary and proper to exercise the powers and effect the objects above specified."

The Water Board, under the Charter, is the second sub-department of Public Improvements, and it has charge of the water supply of the inhabitants of the city.

By Ordinance No. 26, approved March 9th, 1896, and codified as section 1, Article 40 of the Baltimore City Code, of 1906, it was ordained that: "The Water Board shall have power to make and pass all rules and regulations for the government of the board, the laying and tapping of pipes, or for the protection and preservation of the said pipes, or other property and appurtenances of the water works; and to affix penalties, and to enforce the same for any violation of their rules and regulations; it shall also have power to adopt all necessary regulations to preserve the purity of the water, and to enact and enforce such rules, regulations and penalties as they may deem necessary, in accordance with the provisions of this Code." A prior ordinance is found in the City Code of 1893 (Art. 54, sec. 1, † which authorizes the Water Board "to make and pass rules and regulations for the government

---

*See page 46 of Edition of 1915 of the Charter of Baltimore City.

†See Baltimore City Code 1879, Art. 53, sec. 1, ordinances.

of the board, the laying of pipes and for the protection and preservation of said pipes or other property and appurtenances of the Water Works." These ordinances passed in pursuance of power granted by the State, were valid local laws. *Gould* v. *Baltimore City,* 120 Md. 534.

Prior to the passage of this latter ordinance, an ordinance was passed in November, 1892,* prohibiting any person, persons, or corporations from tearing up the streets, without first having obtained a written permit therefor, from the City Commissioner, approved by the Mayor. This ordinance was recognized as valid in *State* v. *Latrobe,* 81 Md. 233, and acting under the authority conferred upon it by the Ordinance of 1893, above referrd to, the Water Board in October, 1895, passed the following rule:

> "Rule 14. Whenever an application is made to this Department for introduction of water for any premise or premises wherein the city main may lay, said street being covered with asphalt pavement, asphalt block, belgian block, or any improved pavement, this Department will not introduce the supply of water until the applicant or applicants have obtained a permit from the City Commissioner's Department and endorsed by the Mayor for this Department to open the street. And be it further understood that the applicant or applicants will have to bear all the expenses for the proper repairs and repaving of any such street."

One of the main objects of the rule was the preservation and protection of the streets and highways of the city, and the Water Board evidently had in mind the ordinance of 1892 and the opinion of this Court in *State* v. *Latrobe, supra,* which was filed April 4, 1895. This rule has been in force and acted upon by the Water Board ever since its adoption, with one single practical modification. As the Highways Engineer is with respect to the issuance of the permit, the legal successor of the City Commissioner's Department, the issuing of the permit now devolves upon him, but it must, however, be endorsed by the Mayor.

*Ordinance M. & C. C. No. 2, approved Nov. 18, 1892.

It is argued that this rule is void: *First,* because it is unreasonable; and *secondly,* that the grant of power to make it is an unlawful delegation of power to the Water Board. As to the first contention it must be apparent from what we have said, that the rule is an expression of the long established policy of the city and is founded upon considerations of public welfare. Nor do we think the rule *"delegatus non potest delegare"* applies. The corporation may act in such matters by its officers and agents. This was recognized in *State* v. *Latrobe, supra,* and, as said by JUDGE SCHMUCKER in *Downs* v. *Swann,* 111 Md. 53: "It has been settled by numerous decisions that the State may delegate the police power to subordinate boards and commissions, and that the reasonable and just exercise by them of the delegated power will be upheld." In this connection we may also refer to *Commissioners of Easton* v. *Covey,* 74 Md. 262, and *Brown* v. *Stubbs,* 128 Md. 129.

JUDGE PEARCE said in *Rossberg* v. *State, supra,* that the powers vested in the city "are broad and sweeping, and are expressed in terms which indicate a liberal view of the need of broad powers for effective local government of a great city." The writ was not directed against the Mayor, and there is nothing to indicate that his objection to the issuance of a permit was based upon passion, prejudice, hostility, or any unworthy motives. He was exercising his best judgment in the public interests in maintaining what we think to be a wise public policy. It was said in *Upshur* v. *Baltimore, supra,* that the writ of mandamus "is based upon reasons of justice and public policy to preserve peace, order and good government," *Poe's Prac.,* sec. 708, and it obviously, therefore, will not be granted where those ends would be subverted or might be frustrated.

For the reasons stated we sustain the validity of rule 14 of the Water Board, and it follows from that holding that the appellees were not entitled, under the authorities cited, to the writ of mandamus, and the order appealed from must be reversed and the petition dismissed.

*Order reversed and petition dismissed with costs.*