901 A.2d 279

Kevin P. CLARK

v.

Martin O'MALLEY et al.

No. 276, Sept. Term, 2005.

Court of Special Appeals of Maryland.

June 30, 2006.

Neal M. Janey (Stuart O. Simms, A. Dwight Petit, on the brief), Baltimore, MD, for appellant.

Ralph S. Tyler, City Solicitor (Joshua N. Auerbach, on the brief,) Baltimore, MD, for appellee.

Panel: KENNEY, BARBERA, McAULIFFE, JOHN F. (Retired, specially assigned), JJ.

KENNEY, J.

Appellant, Kevin P. Clark ("Clark"), appeals the decision of the Circuit Court for Baltimore City granting summary judgment in favor of Mayor Martin O'Malley and the Mayor and City Council of Baltimore ("the Mayor"). Clark presents one question, which we have rewritten as follows: [1]

Did the circuit court err in granting appellee's motion for summary judgment?

---

[1] Appellant presents the following question:
Did the trial court err in effectively halting discovery and terminating the Scheduling Order by considering and granting Defendant's Motion for Summary Judgment?

For the following reasons, we shall reverse the circuit court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

In February 2003, the City of Baltimore and Clark entered into a Memorandum of Understanding ("MOU") "to employ the services of Clark as the Police Commissioner of Baltimore City." The City Council confirmed Clark's appointment on March 3, 2003.

Relevant provisions of the MOU include the following:

SECTION 1. *EMPLOYMENT*

The City hereby engages the services of Clark to act as the Police Commissioner of the Baltimore City Police Department to serve the remaining term of the last Commissioner until June 30, 2008 ("Initial Term"). During the Initial Term Clark shall receive a salary of One Hundred Fifty Thousand Dollars ($150,000) per annum to be paid bi-weekly.

SECTION 2. *ADDITIONAL COMPENSATION/SEVERANCE PAY.*

A. The Commissioner recognizes that he may be terminated by the City pursuant to the removal provisions by the Mayor in Baltimore City Code of Public Local Laws (§ 16–5[e]) [2] and nothing in this Agreement shall affect the rights of the Mayor in that respect. However, except as stated in Section 3 [3] and for just cause as defined below,

---

**2.** Section 16–5(e) of the Code of Public Local Laws of Baltimore City (2005) states: "The Police Commissioner is subject to removal by the Mayor for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers."

**3.** Section 3 of the MOU, entitled "Voluntary Separation," states:

A. Should Clark voluntarily leave the City's employment within the first year of employment or should Clark be terminated for cause within the first year of employment, Clark shall reimburse the City for any and all moving and relocation expenses paid by the City pursuant to Section 6 below.

Clark shall be entitled to receive the additional compensation/severance pay as provided in section 2.B. of this Agreement regardless of the reasons for the termination of employment by the Mayor or City. Just cause for the purpose of this section shall be defined as:

(1) Gross dereliction of duty; as to any one incident or series of conduct.

(2) Illegal use of intoxicants or drugs; or

(3) Indictment of a felony or any other crime involving moral turpitude or theft.

B. If Clark is willing and able to perform employment duties under this Agreement and the employment of Clark is (1) terminated in the Initial Term by City for any reason other than for just cause as defined in Paragraph 2.A.; or (2) in the event Clark is forced to resign following a formal or informal suggestion by the Mayor that he resign; or (3) that Clark's salary is reduced below his present annual salary without Clark's written consent; or (4) in the event, for any reason whatsoever other than for just cause as above defined the Mayor does not reappoint and the Council confirm the reappointment of Clark to a full six-year term immediately following the Initial Term, City agrees to pay Clark a lump sum payment, as and for additional compensation/severance, equal to six (6) months aggregate salary, including retirement benefits calculated as the employer's share of retirement benefits at the time of termination or non-reappointment as defined herein. Clark shall also be fully compensated for any accrued sick leave, vacation, compensatory time and any other accrued benefits at the time of termination or failure of reappointment. Should Clark not be reappointed or terminated without just cause, Clark agrees that the additional compensation/severance lump sum payment set out above shall satisfy all obligations

---

B. Should Clark voluntarily leave the City's employment for any reason whatsoever during the first three years of employment, Clark shall not be entitled to receive the additional compensation/severance pay, pursuant to Section 2 above.

City has to Clark as a result of the termination/non-reappointment.

* * *

SECTION 12 *RIGHT TO TERMINATE WITHOUT CAUSE*

Either party may terminate this contract at any time, by giving forty-five (45) days prior written notice to the other. Notwithstanding the above sentence the provisions of Section 2B remain in force.

SECTION 13 *NOTICES*

Notices pursuant hereto shall be effective when hand-delivered or when mailed by certified mail. All notices to the City shall be addressed to the City at the Office of Law.... All notices from the City to Clark shall be addressed to an address to be named by Clark not more than 10 days after the execution of this contract and updated from time to time when his address changes.

On November 10, 2004, the City Solicitor delivered a letter to Clark giving him forty-five days' notice of his termination as Police Commissioner, and relieving him of his duties:

This notice is sent on behalf of the Mayor and City Council of Baltimore (the "City") pursuant to Sections 12 and 13 of the Memorandum of Understanding ("MOU") between you and the City dated February 19, 2003. This notice shall serve as the City's 45–day notice of termination of your employment. Thus, your employment shall terminate 45 days from today. However, as the Mayor announced this morning, you have been relieved of all official duties as of 8:30 a.m., November 10, 2004, and therefore, your further access, if any, to Police Department facilities, equipment, or documents will be subject to the specific, prior authorization of Acting or Interim Police Commissioner Hamm.

The City will begin immediately to do a calculation of the salary and benefits to which you may be due under the

February 19 MOU and will advise you of the details once appropriate calculations are made.

On November 16, 2004, Clark filed a complaint in the Circuit Court for Baltimore City, seeking declaratory relief, injunctive relief, money damages, and reinstatement to his former position as Police Commissioner.

On December 13, 2004, the Mayor moved to dismiss or, in the alternative, for summary judgment. The court held a hearing on January 31, 2005, after which it denied summary judgment, finding a genuine dispute of material facts related to the Mayor's issuance of notice of termination to Clark.

Clark filed an amended complaint on December 28, 2004. The Mayor again moved for summary judgment on February 10, 2005, asserting that admissible evidence clearly established that there was no genuine dispute of material fact with respect to notice.

The court held a hearing on April 4, 2005. After argument by counsel, the court found that the MOU is a valid and unambiguous contract, and that Clark had been properly terminated after proper notice was given pursuant to sections 12 and 13 of the MOU. The court thereby granted the Mayor's motion for summary judgment. The Court issued a declaratory judgment on April 4, 2005, stating that the Mayor had properly terminated Clark without cause, and with proper notice. Clark noted this appeal on April 5, 2005. Additional facts will be provided as necessary to our discussion of the issues.

## STANDARD OF REVIEW

The circuit court may grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Maryland Rule 2–501(f). "This Court reviews the same material from the record and decides the same legal issues as the circuit court." *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24 (1998). Accordingly, "[w]hen reviewing a

grant of summary judgment, we first determine whether a genuine dispute of material fact exists." *Mitchell v. Baltimore Sun Co.,* 164 Md.App. 497, 507, 883 A.2d 1008 (2005). "If the record reveals that a material fact is in dispute, summary judgment is not appropriate." *Serio v. Baltimore County,* 384 Md. 373, 388, 863 A.2d 952 (2004). "If we determine that no genuine issue of material fact is present, then we must decide 'whether the [trial] court reached the correct legal result.'" *Crews v. Hollenbach,* 126 Md.App. 609, 625, 730 A.2d 742 (1999) (quoting *Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.,* 120 Md.App. 538, 547, 707 A.2d 913 (1998)). "In making our analysis, we do not accord deference to the trial court's legal conclusions." *Lopata,* 122 Md.App. at 83, 712 A.2d 24.

## DISCUSSION

### I. Is there a Final Judgment?

At oral argument, Clark asserted that the court's grant of summary judgment applied to only count 10 of his amended complaint, which alleged "Breach of Contract—Termination Without Cause/Contract." To the contrary, we conclude that the court's judgment pertained to all of Clark's claims.

 Clark's amended complaint included ten counts. In count 1, Clark argued that the Mayor's removal of him was illegal because it violated section 16–5(e) of the Code of Public Local Laws of Baltimore City (2005) ("PLL"), and sought declaratory and injunctive relief. In counts 2, 3, 4, and 5, Clark sought a declaratory judgment, injunctive relief, a writ of *quo warranto,* and a writ of mandamus based on the Mayor's alleged violation of PLL § 16–5(e). Clark also based his count 5 request for a writ of mandamus on the argument that his termination violated his due process rights under Article 24 of the Maryland Declaration of Rights. In count 6, Clark sought a writ of certiorari based on the Mayor's alleged violations of PLL § 16–5(e) and Article 24. In count 7, Clark asked for declaratory and injunctive relief based on the alleged violation of his rights under Article 24. In counts 8 and

9, Clark averred that the Mayor breached the terms of the MOU by terminating him without cause. In count 10, Clark asserted that his termination without cause violated the terms of the MOU because he was not given proper notice.

After the hearing on April 4, 2005, the court announced its judgment at follows:

> Counsel, the court has had an opportunity to review the papers. The court's had an opportunity to review the contract, the notice that was provided on November 10th, 2004, the statutory references that were made in the plaintiff's papers to the public local law and the city charter as well as to the Maryland Declaration of Rights and consider all of the arguments that were presented this morning and I'm prepared to rule. On the basis of the record the court has before it, for purposes of this summary judgement [sic] motion, this court does not see that there are material facts in dispute at this point nor does the court find either conflict in the contract provisions or ambiguity in the contract provisions. And the court is prepared to enter declaratory judgment holding that the contract between the Police Commissioner Clark and the Mayor and City Council dated February 2003 .... is a valid contract[,] that pursuant to Section[s] 11 and 12 of that contract appropriate notice was given to the Police Commissioner on November 10, 2004, that he was lawfully terminated without cause[,] and that the defendants are entitled to summary judgment.

The circuit court's declaratory judgment, issued April 4, 2005, stated in relevant part:

> 2. The Memorandum of Understanding between Clark and the City is a valid and binding contract.
>
> 3. Section 12 of the Memorandum of Understanding unambiguously provides both parties with a right to terminate without cause upon giving forty-five days prior written notice to the other.
>
> 4. Section 12 is a valid and binding provision of the Memorandum of Understanding.

5. On November 10, 2004, the defendants sent a notice to Clark, through counsel, that Clark's employment as Police Commissioner would be terminated without cause in forty-five days pursuant to Section 12 of the Memorandum of Understanding.

6. Clark received the forty-five days prior notice of termination to which he was entitled.

7. The City properly exercised its right to terminate Clark's employment without cause pursuant to Section 12 of the Memorandum of Understanding.

■ It is a long-standing rule that "the right to seek appellate review of a trial court's ruling ordinarily must await the entry of a final judgment that disposes of all claims against all parties." *Maryland State Bd. of Educ. v. Bradford*, 387 Md. 353, 382, 875 A.2d 703 (2005). Maryland Rule 2–602(a) states:

Except as provided in section (b) of this Rule,[4] an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:

(1) is not a final judgment. . . .

Indeed, "[t]here can be no final judgment until every claim is resolved." *Tierco Maryland, Inc. v. Williams*, 381 Md. 378, 393, 849 A.2d 504 (2004).

Here, the court found that the Mayor had a valid contractual right to terminate Clark without cause because the MOU "is a valid and binding contract." Thus, the court's grant of

4. Maryland Rule 2–602(b) states:

If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:

(1) as to one or more but fewer than all of the claims or parties; or

(2) pursuant to Rule 2–501(f)(3), for some but less than all of the amount requested in a claim seeking money relief only.

summary judgment and subsequent declaratory judgment clearly resolved all of Clark's claims that were based on arguments that his termination violated PLL § 16–5(e) or the terms of the MOU. Specifically, the court's judgment disposed of counts 1–4 and 8–10 in their entirety, and counts 5 and 6 to the extent they were based on the Mayor's alleged violation of PLL § 16–5(e).

██ Counts 5 and 6 were based in part, and count 7 was based in its entirety, on Clark's assertion that his termination violated his due process rights under Article 24 of the Maryland Declaration of Rights.[5] Article 24 protects, among other things, an individual's interest in procedural due process. *Samuels v. Tschechtelin*, 135 Md.App. 483, 523, 763 A.2d 209 (2000).

██ "To be successful in an action alleging denial of procedural due process in violation of a property interest, a plaintiff must demonstrate that he had a protected property interest, that he was deprived of that interest, and that he was afforded less process than was due." *Id.* A colorable property interest in a position of employment requires " 'a legitimate claim of entitlement' " to continued employment. *Id.* at 524, 763 A.2d 209 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). That claim must be grounded on a source apart from Article 24 itself, " 'such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits,' " or "[a] public employment contract." *Samuels*, 135 Md.App. at 524, 527, 763 A.2d 209 (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701). The circuit court's finding that the City "exercised its right to terminate Clark's employment without cause pursuant to Section 12 of the Memorandum of Understanding," constituted an implicit finding that Clark did not have a legitimate

---

**5.** Article 24 of the Maryland Declaration of Rights states: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

property interest in continued employment and, thus, that he had received any process due to him under the circumstances. The court's judgment resolved all of Clark's claims that were based on an alleged violation of his due process rights and was an appealable final judgment.

## II. Was there a Genuine Dispute of Material Fact?

Clark contends that the circuit court abused its discretion in granting summary judgment prior to the completion of discovery. In addition, he argues that certain material facts are genuinely disputed.

### A. Grant of Summary Judgment Prior to Completion of Discovery

■ Clark argues that the court's grant of summary judgment prior to the completion of discovery "effectively terminated the Scheduling Order without a full factual record having been developed," and that "[d]iscovery would have established a full evidentiary record that the Court should have had before ruling on a dispositive Motion for Summary Judgment."

■ To be sure, the circuit court may "deny a motion for summary judgment so that a more complete factual record can be developed." *A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 262–63 634 A.2d 1330 (1994). Maryland Rule 2–501(d) provides as follows:

If the court is satisfied from the affidavit of a party opposing a motion for summary judgment that the facts essential to justify the opposition cannot be set forth for reasons stated in the affidavit, the court may deny the motion or may order a continuance to permit affidavits to be obtained or discovery to be conducted or may enter any other order that justice requires.

" 'The timing of a summary judgment ruling, i.e., whether it is to be postponed pending completion of discovery or denied in favor of submission to the fact-finder, falls within the trial court's discretion and will be reviewed only for abuse of

discretion.'" *Chaires v. Chevy Chase Bank,* 131 Md.App. 64, 88, 748 A.2d 34 (2000) (quoting Paul V. Niemeyer & Linda M. Schuett, Maryland Rules Commentary 95 (2d ed.1992, Supp. 1998)).

Clark did not submit an affidavit pursuant to Rule 2–501(d). In his brief, he focuses primarily on the court's scheduling order, and argues that he was "substantially prejudiced" by the grant of summary judgment prior to the completion of discovery in accordance with the order.

The status of the scheduling order, in and of itself, has no direct bearing on whether the court's grant of summary judgment prior to the completion of discovery was an abuse of discretion. Maryland Rule 2–501(a) provides that "[a]ny party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." The court could consider the status of discovery under a scheduling order in its decision to grant or deny summary judgment, but the rule is not limited by such an order.

Given Clark's failure to support his allegations that there were disputes of material fact with "an affidavit or other written statement under oath," Md. Rule 2–501(b), or an affidavit "that the facts essential to justify the opposition cannot be set forth for reasons stated in the affidavit," Md. Rule 2–501(d), we are not persuaded that the circuit court erred or abused its discretion in considering the motion for summary judgment prior to completion of discovery under the scheduling order.

## B. Clark's Assertion of Genuinely Disputed Material Facts

In the memorandum in support of his motion for summary judgment, and at the motion hearing, the Mayor asserted that the material facts surrounding Clark's termination were not in dispute: that the City entered into the MOU with Clark, the terms of which included a right on the part of either party to terminate Clark's employment without cause upon forty-five

days' written notice; that Clark was given notice of termination required by section 12 of the MOU on November 10, 2004; and that Clark was sent a check that would have satisfied the terms of the MOU in the event of termination.

In support of his motion, the Mayor submitted the affidavit of the City Solicitor, who stated that he wrote and delivered the notice letter to Clark on November 10, 2004. The Mayor also submitted the affidavit of Lieutenant Robert Haukdal, the Acting Director of the Fiscal Section of the Baltimore Police Department. Haukdal stated in his affidavit that, after Clark's termination, the City continued to pay his biweekly salary of $5,769.24 through December 25, 2004. He also stated that the City sent Clark a check in the amount of $8,513.22 for "unused vacation time and comp time," and "a check for $49,318.76, reflecting Mr. Clark's aggregate salary for six months ($75,000), minus deductions." The relevant payroll records and photocopies of the checks that were sent to Clark were included.

In his response, Clark argued that, because the Mayor's answer to the amended complaint was in the form of general denials, "Defendants by their own pleading have put at issue every material fact concerning every claim alleged in Plaintiff's Complaint." Clark asserted that there were disputes of material fact surrounding the notice of termination, arguing in his response memorandum that the notice was "inefficient and defective" because it was issued by the City Solicitor, rather than the Mayor, and because the Board of Estimates took no part in his termination. He asserted that whether the notice satisfied the contractual requirement of forty-five days was also in dispute.[6] Clark further contended in his memorandum that, with regard to his claim of deprivation of due process, "[i]t is disputed whether Plaintiff received ... notice and was given an opportunity to be heard before his removal and termination."

---

6. At the motion hearing, Clark argued that the precise timing of the delivery of the notice was in dispute.

Clark submitted no affidavits or other documents demonstrating the alleged factual disputes. At the hearing, counsel noted that "[w]e did submit a[ ] verif[ied] complaint."

Maryland Rule 2–501(a) provides:

Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit if it is (1) filed before the day on which the adverse party's initial pleading or motion is filed or (2) based on facts not contained in the record.

█ The party moving for summary judgment shoulders the burden of proof that no genuine dispute of material fact exists. *Carter v. Aramark Sports & Entm't Servs.*, 153 Md. App. 210, 224, 835 A.2d 262 (2003). The movant may satisfy that burden by "identify[ing] portions of the record that demonstrate absence of a genuine issue of material fact," *Nerenberg v. RICA of S. Maryland*, 131 Md.App. 646, 660, 750 A.2d 655 (2000), or "by placing before the court facts that would be admissible in evidence or otherwise detailing the absence of evidence in the record to support a cause of action." *Bond v. Nibco, Inc.*, 96 Md.App. 127, 134, 623 A.2d 731 (1993).

The response to a motion for summary judgment is governed by Maryland Rule 2–501(b):

A response to a written motion for summary judgment shall be in writing and shall (1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute. A response asserting the existence of a material fact or controverting any fact contained in the record shall be supported by an affidavit or other written statement under oath.

█ "In order for there to be disputed facts sufficient to render summary judgment inappropriate 'there must be evi-

dence on which the jury could reasonably find for the plaintiff.' " *Danielewicz v. Arnold,* 137 Md.App. 601, 612–13, 769 A.2d 274 (2001) (quoting *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 244, 603 A.2d 1357 (1992)). "Once the movant makes his showing, the burden shifts to the nonmoving party to 'identify with particularity the material facts that are disputed.' " *Nerenberg,* 131 Md.App. at 660, 750 A.2d 655 (quoting Md. Rule 2–501(b)). As stated in Niemeyer & Schuett, *supra,* at 357 (3d ed.2003):

> A response that simply denies or argues that the facts are in dispute without inclusion of an affidavit or other admissible evidence is insufficient. The court cannot treat bald allegations in a response as creating a disputed fact, any more than it can assume that contentions made in an opening statement or closing argument dispute evidence introduced at trial.

The Mayor's motion for summary judgment alleged specific facts that were not in dispute. He submitted affidavits and other evidence in support of his motion. In his response, Clark merely propounded a number of arguments alleging factual disputes. With respect to each of his arguments, however, Clark either failed to identify with particularity the disputed facts, failed to demonstrate that the facts were in dispute, or failed to support the alleged dispute with affidavits or other documentation.

Clark's contention that the Mayor's general denial of most of the averments in the second amended complaint places all of the facts alleged in the complaint in dispute patently does not "identify with particularity" the supposed factual disputes. Md. Rule 2–501(b). Similarly, his argument in his brief to this Court that "[a]ll of the facts as alleged underlying [his due process] claims are disputed" does not demonstrate any error by the circuit court in its application of Maryland Rule 2–501(b).

The Mayor does not dispute that the City Solicitor, rather than the Mayor, delivered to Clark the notice of termination. Likewise, it is undisputed that the Board of Estimates did not

participate in Clark's termination. Thus, Clark has not raised a genuine dispute as to those facts. It is the legal implications, and thus the materiality, of those facts that is in dispute. *See O'Connor v. Baltimore County*, 382 Md. 102, 111–12, 854 A.2d 1191 (2004) (stating that a dispute over whether employment regulations enacted by the County violated the County charter is not a factual dispute).

Clark likewise failed to raise a factual dispute as to whether he received proper notice. The Mayor contends that Clark was terminated without cause upon forty-five days' notice in accordance with the MOU. It is unclear whether Clark continues to assert that there is a dispute regarding whether the notice itself satisfied the terms of the MOU. It appears that he argues that notice was insufficient due to the timing of the delivery of that notice based on the fact that the Mayor had announced his termination several hours before the notice was delivered, a fact that is not disputed. In his brief to this Court, he states that "[t]hose material facts were disputed by Defendants in their Answer, but then essentially admitted in their Motion for Summary Judgment." Thus, Clark seems to recognize that the facts surrounding the timing of the delivery of the notice are not in dispute.

Despite his argument that the timing of the notice was disputed, he failed to "identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute." Md. Rule 2–501(b). Moreover, the effectiveness of the notice under the terms of the MOU is not a factual dispute, but, rather, the basis for Clark's legal argument that the Mayor breached the terms of the MOU. *See O'Connor*, 382 Md. at 111–12, 854 A.2d 1191.

We perceive no error in the circuit court's finding that there is no genuine dispute of material fact. We turn now to whether the Mayor was entitled to judgment as a matter of law.

### III. Is the Mayor Entitled to Judgment
### as a Matter of Law?

*A. The Mayor's Power to Remove the Police Commissioner*

Clark presents four somewhat related arguments with regard to the Mayor's authority to remove the Police Commissioner and name a new Police Commissioner. First, Clark claims that, because he took an oath of office upon his appointment as Police Commissioner, he is a public officer who could not be removed by the Mayor at will. Second, he asserts that the Police Commissioner is independent from the "interference and control" of the Mayor. Third, he argues that the Mayor may remove a police commissioner only in accordance with the PLL, which provides for removal of the Commissioner only for cause. Finally, he contends that, because he was not legitimately removed from his position, the Mayor had no authority to appoint a new Police Commissioner.

The Mayor, in response, contends that he has the power to enter into a contract with a police commissioner that provides for removal without cause. He also argues that the matters of appointing and removing the Police Commissioner are "peculiarly local in character," and that a decision limiting his power to do so would improperly impinge on the City's authority over its Police Commissioner.

Article XI–A of the Constitution of Maryland provides for limited self-government by the various counties and Baltimore City.

> Ratified by the voters in 1915, Art. XI–A, popularly known as the Home Rule Amendment, provides for the distribution of powers between the State Legislature and the political subdivisions of the State; the underlying purpose of the Article is to share with the counties and Baltimore City, within well-defined limits, powers formerly reserved to the General Assembly so as to afford the subdivisions certain powers of self-government.

*Cheeks v. Cedlair Corp.*, 287 Md. 595, 597, 415 A.2d 255 (1980). Section 1 of Article XI–A provides for "the election of a charter board" in any county or the City, to "prepare . . . a charter or form of government" for that entity. Md. Const. art. XI–A, § 1.

" '(A) charter . . .' which the voters of Baltimore City or any county may adopt under Art. XI–A, s 1 is, in effect, a local constitution which forms the framework for the organization of the local government. . . ." *Cheeks*, 287 Md. at 606, 415 A.2d 255. *Accord Maryland State Admin. Bd. of Election Laws v. Talbot County*, 316 Md. 332, 341, 558 A.2d 724 (1988); *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel County*, 283 Md. 48, 58, 388 A.2d 523 (1978).

After the City or a county adopts a charter by popular election, it "shall become the law of said City or County, subject only to the Constitution and Public General Laws of this State, and any public local laws inconsistent with the provisions of said charter and any former charter of the City of Baltimore or County shall be thereby repealed." Md. Const. art. XI–A, § 1.

Baltimore City adopted a charter ("the Charter"), pursuant to Article XI–A, in 1918. *Cheeks*, 287 Md. at 599, 415 A.2d 255. The Charter provides that the Mayor has the power to appoint municipal officers: "Except as otherwise provided in the Charter, the Mayor shall have the sole power of appointment of all municipal officers, subject to confirmation by the City Council by a majority vote of its members. . . ." Charter, art. IV, § 6(a). The Charter further provides that the Mayor may remove municipal officers:

> The Mayor shall have the power to remove at pleasure all municipal officers, except members of boards and commissions established by Charter or other law, appointed by the Mayor in the manner prescribed in this section and confirmed by the City Council; provided, however, that appointees holding office pursuant to the provisions of the Charter

relating to the Civil Service may be removed from office only in accordance with such provisions.

Charter, art. IV, § 6(c).

"Officer" and "municipal officer" are defined in the Charter to "include, but ... not be limited to, the heads of all departments and bureaus, the members of all commissions and boards, and persons who exercise authority comparable to that of heads of departments or bureaus." Charter, art. I, § 2(f). Article VII of the Charter provides for a number of executive departments: finance, law, public works, fire, health, social services, education, recreation and parks, planning, municipal and zoning appeals, legislative reference, Civil Service Commission, Board of Ethics, and transportation. The Charter does not address the organization of the police department, or the appointment or removal of the Police Commissioner; the only reference to the Police Commissioner in the Charter is by way of limitation. Article II, which describes the general powers of the Mayor and City Council, states:

> To have and exercise within the limits of Baltimore City all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits; provided, however, that no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner.

Charter, art. II, § 27.

The 1796 Act of the General Assembly incorporating the City of Baltimore empowered the City "to pass ordinances 'to prevent and remove nuisances,'" and also "through its own police to enforce them." *Altvater v. Mayor & City Council of Baltimore,* 31 Md. 462, 467 (1869). From that time until 1860, "[t]he Mayor and City Council of Baltimore ... had ... an organized police force for the protection of the city, which had been, from time to time, increased in number, and the regulation thereof changed as the wants of the people seemed to require." *Mayor & City Council of Baltimore v. State,* 15 Md. 376, 454 (1860). According to the Court of Appeals in

*Upshur v. Mayor & City Council of Baltimore,* 94 Md. 743, 756–57, 51 A. 953 (1902):

> [D]uring [the] period when the police force was wholly under the control of the municipality, the city authorities failed to suppress the disorder and lawlessness which prevailed to an alarming extent, and the riots and bloodshed which invariably accompanied a general or local election. The law was defied; the public peace was disturbed; the constabulary were powerless, if not in sympathy with the mob, and reputable citizens were driven by violence from the polls. Relief from the intolerable conditions which existed was finally sought by an appeal to the General Assembly. . . .

By the Acts of 1860, ch. 7, the General Assembly repealed all laws and ordinances with respect to the Baltimore City police and created a new police department under the control of commissioners appointed by the General Assembly. *Mayor & City Council of Baltimore,* 15 Md. at 454–55. *See also Mayor & City Council of Baltimore v. Silver,* 263 Md. 439, 447, 283 A.2d 788 (1971); *Phillips v. Ober,* 197 Md. 167, 170, 78 A.2d 630 (1951); *McEvoy v. Mayor & City Council of Baltimore,* 126 Md. 111, 115, 94 A. 543 (1915); *Upshur,* 94 Md. at 756–57, 51 A. 953. The Court of Appeals later explained:

> . . . *Act of 1860, ch. 7,* completely separat[ed] the police department from the city government. . . . The Police Board was created and its members and the force enrolled by them were made State officers and the city was denied, in the most positive manner, any right to interfere with or control the policemen. *The underlying purpose was to deprive the city of all power over the police.*

*Upshur,* 94 Md. at 756, 51 A. 953.[7] The Acts of 1860, ch. 7, withstood an immediate legal challenge by the City. *Mayor & City Council of Baltimore,* 15 Md. 376. From 1860 to 1900, in addition to its authority to appoint the police commissioners,

---

7. The Court of Appeals further opined: "The change made Baltimore one of the most law-abiding communities in the country." *Upshur,* 94 Md. at 757, 51 A. 953.

the General Assembly had the power to remove the commissioners "for official misconduct." *Cull v. Wheltle,* 114 Md. 58, 78, 78 A. 820 (1910). In 1900, the power to appoint and remove the police commissioners was transferred to the Governor. *Id.* at 78–79, 78 A. 820.

By Acts of 1966, ch. 203, the General Assembly enacted PLL § 16–2, which stated in part, "[t]he Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland." PLL § 16–2(a) (1969). The Police Commissioner was designated the head of the department: "The affairs and operations of the department shall be supervised and directed by a commissioner of police, who shall function as the chief police and executive officer of the department, and be known as the Police Commissioner of Baltimore City." PLL § 16–4 (1969). The General Assembly also codified the appointment and removal of the Commissioner by the Governor. PLL § 16–5(a) (1969) provided that "[t]he Police Commissioner of Baltimore City shall be appointed by the Governor of Maryland for a term of six years." Section 16–5(e), entitled "Removal," stated: "Said Commissioner shall be subject to removal by the Governor for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers."

In 1976, the General Assembly modified sections 16–5, 16–6, and 16–9 of the PLL "[f]or the purpose of providing that the Police Commissioner of Baltimore City be appointed by the Mayor of Baltimore City." Laws of Maryland 1976, ch. 920. To that end, the Act changed the language of section 16–5(a): "The Police Commissioner of Baltimore City shall be appointed by the Mayor of Baltimore City, subject to confirmation by the City Council by a majority vote of its members, for a term of six years ...." Also changed was the language of PLL § 16–5(e): "The Commissioner is subject to removal by the Mayor for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers." That is how section 16–5(e) now reads, with the exception that it now refers to

"[t]he Police Commissioner," rather than merely "[t]he Commissioner." *Compare* Laws of Maryland 1976, ch. 920, *with* PLL § 16–5(e). The General Assembly made no changes to PLL § 16–2, which still designates the Police Department as "an agency and instrumentality of the State of Maryland." Likewise, the General Assembly left unchanged section 16–4, which states that the Police Commissioner is "the chief police and executive officer of the department."

In cases dating back to shortly after the creation of the police department, the Court of Appeals has consistently held that the City is not liable for the actions or inaction of members of the department. *Silver*, 263 Md. 439, 283 A.2d 788; *Green v. Mayor & City Council of Baltimore City*, 181 Md. 372, 30 A.2d 261 (1943); *Taxicab Co. of Baltimore City v. Mayor & City Council of Baltimore*, 118 Md. 359, 84 A. 548 (1912); *Sinclair v. Mayor & City Council of Baltimore*, 59 Md. 592 (1883); *Altvater*, 31 Md. 462.

*Silver* arose from the riots that occurred in Baltimore City after the assassination of Dr. Martin Luther King, Jr., in 1968. Hundreds of victims of property destruction brought suit against the City, invoking the Riot Act of 1835, which provided for suits against local governments to recover damages that resulted from riots. The City argued that because the police department is an agency of the State, and it had no direct control over the department, it could not be liable under the Riot Act. The Court agreed that the department is a State entity and beyond the control of the City government:

[I]t may be fairly stated that The Police Omnibus Act of 1966, [ch. 203 of the Acts of 1966,] the Act which affects the instant case, does not differ greatly from its predecessor acts insofar as separating the City from any control over the police department is concerned. In The Police Omnibus Act of 1966, control of the department is vested in the State with immediate supervision and direction of the department under a police commissioner who is appointed by the Governor. Further support for the autonomy of the police department is found in Article 2, Section 27 of the Charter of the City which provides that, "(N)o ordinance of the City or

act of any municipal officer shall conflict, impede, obstruct, hinder, or interfere with the powers of the Police Commissioner."

*Silver,* 263 Md. at 450, 283 A.2d 788 (footnote omitted).

*Clea v. Mayor & City Council of Baltimore,* 312 Md. 662, 541 A.2d 1303 (1988), was decided after the General Assembly had transferred the power to appoint the Police Commissioner from the Governor to the Mayor of Baltimore City. The Court, in *Clea,* again held that the City did not incur *respondeat superior* liability for the tortious acts of police officers. The Court grounded its holding on the department's status as a State agency:

By Ch. 367 of the Acts of 1867, the General Assembly of Maryland made the Police Department of Baltimore City a state agency; its officials and officers were designated as state officers. Since that time, this Court has consistently held that Baltimore City should not be regarded as the employer of members of the Baltimore City Police Department for purposes of tort liability. . . .

It is true that, by Ch. 920 of the Acts of 1976, the General Assembly transferred the power to appoint the Baltimore City Police Commissioner from the Governor to the Mayor of Baltimore City. At the same time, however, the General Assembly maintained the express designation of the Baltimore City Police Department as a *state* rather than a local government agency. Furthermore, the General Assembly, and not the Baltimore City Council, has continued to be the legislative body enacting significant legislation governing the Baltimore City Police Department.

*Clea,* 312 Md. at 668–69, 541 A.2d 1303 (citations and footnote omitted).

In *Baltimore Police Dept. v. Cherkes,* 140 Md.App. 282, 780 A.2d 410 (2001), this Court determined that the Baltimore City Police Department enjoys State sovereign immunity from tort liability. Our analysis included a discussion of the status of the police department as a State agency:

By Chapter 367 of the 1867 Laws of Maryland, the General Assembly made the BCPD a State agency, and designated its officials and officers as State officers. That enactment appears today in section 16–2(a) of the Public Local Laws of Baltimore City....

\* \* \*

Article 16 of the Code of Public Local Laws of Baltimore City, entitled "Police Department," is a comprehensive set of local laws passed by the General Assembly that creates the BCPD and governs its operation.....

\* \* \*

By contrast, the Baltimore City Charter, by which the powers, structure, and functions of the City government are defined, makes no mention of the BCPD, a police department, or any police force. Indeed, the sole reference to the Commissioner is by way of limitation of the City's powers....

The BCPD is entirely a creature of the General Assembly, as Article 16 of the Code of Public Local Laws of Baltimore City makes plain. The Court of Appeals's observation in *Clea*, in 1988, that the General Assembly, not the Baltimore City Council, is the legislative body that enacts significant legislation directing the structure and functions of the BCPD, is as true today as it was 13 years ago. *Id.* at 303, 311–12, 780 A.2d 410 (citations and footnotes omitted).

The appointment and removal of public officers is governed by constitutional provisions or statutes. *See Buchholtz v. Hill*, 178 Md. 280, 284, 13 A.2d 348 (1940) (stating that "[t]he power to select the public officials of a State resides originally in the people, who may provide in their Constitution how the power shall be exercised, or leave to the Legislature the privilege of providing for the selection of any officials"); *Ash v. McVey*, 85 Md. 119, 128–29, 36 A. 440 (1897) (referring to the "power of the Legislature to provide for the appoint-

ment or removal of officers by the statutes creating the offices"). *See also Macaluso v. West*, 40 Ill.App.3d 392, 352 N.E.2d 382 (1976) (stating that, "[i]n the absence of a provision in the Constitution to the contrary, the removal or suspension of a public officer, whether elected or appointed, is generally considered a subject within the control of the legislature, which can designate the grounds for and mode of suspension or removal"); Eugene McQuillan, 4 *Law of Municipal Corporations* § 12.229 (3d ed.2002) (stating that "[t]he subject of the removal of public officers, either elective or appointive, is within legislative control, unless prescribed or limited by organic law"). An official empowered to remove a public officer may do so only in accordance with the constitutional provision or statute providing for the removal. *See Goodman v. Clerk of the Circuit Court for Prince George's County*, 291 Md. 325, 329, 435 A.2d 422 (1981) (stating that a valid appointment requires "strict compliance with the statutory provisions granting the power to appoint"); *Cull*, 114 Md. 58, 78 A. 820 (holding that the Governor's constitutional and statutory power of removal for cause does not include the power to suspend). *See also Golaine v. Cardinale*, 142 N.J.Super. 385, 361 A.2d 593, 597 (1976) (stating that "the power to remove, once conferred, may only be exercised in strict compliance with the procedural and substantive provisions of the applicable statute"); McQuillan, *supra* (stating that "if the power of removal is conferred by the charter or legislative act it can neither be extended nor restricted by ordinance or contract").

In *Buchholtz*, the appellant had filed a petition for a writ of mandamus based on his having been appointed Clerk to the County Commissioners of Allegany County by the Governor. The Court of Appeals stated that "[i]t is well settled in Maryland that the Governor has no inherent power to appoint to office, and that he can make an appointment only when clothed with authority by the Constitution or the Legislature." *Buchholtz*, 178 Md. at 287, 13 A.2d 348. The Court noted the Governor's constitutional power to appoint civil officers " 'unless a different mode of appointment be prescribed by the Law creating the office,' " and to fill vacancies " 'in any office

which the Governor has power to fill.' " *Id.* at 285, 13 A.2d 348 (quoting Md. Constitution art. II, §§ 10–11). The Court determined, however, that the Governor "has no authority to make the appointment of Clerk to the County Commissioners of Allegany County since the Legislature has prescribed that the Clerk shall be elected." *Buchholtz,* 178 Md. at 285, 13 A.2d 348.

*Cull* involved the suspension by the Governor of three members of the Board of Police Commissioners of Baltimore City based on " 'complaints and charges of incompetency and official misconduct' against them." *Cull,* 114 Md. at 77, 78 A. 820. The Court of Appeals explained the Governor's statutory authority with respect to the Commissioners as follows: " '[A]ny of said commissioners shall be subject to removal by the Governor for official misconduct or incompetency, in the manner provided by law in the case of other civil officers.' " *Id.* at 79, 78 A. 820 (quoting Code of Public Local Laws art. IV, § 740 (1900)). Additionally, the Governor was empowered by local law to fill vacancies on the Board.

The Court noted that the Governor's authority to remove commissioners coincided with his constitutional authority to remove civil officers generally:

"The Governor may *suspend* or arrest any military officer of the State for disobedience of orders or other military offense; and may *remove* him in pursuance of the sentence of a Court Martial; and may *remove* for incompetency or misconduct all civil officers who received appointment from the executive for a term of years."

*Cull,* 114 Md. at 79, 78 A. 820 (quoting Md. Constitution art. II, § 15). But, neither the general constitutional authority to remove civil officers, nor the specific statutory authority to remove Police Commissioners, included the power to suspend the Commissioners.

Accordingly, the Court held that the Governor had no such power:

[The] language of [Md. Constitution art. II, § 15] itself must be admitted to be at least suggestive, for when the

same section authorized the Governor to *"suspend* or arrest"* a military officer for causes given, and to *remove* him in pursuance of the sentence of a court-martial, and then, when it deals with civil officers, only authorizes him to *"remove"* them, the maxim, *"expressio unius est exclusio alterius"* naturally suggests itself. There is no other power of removal of these officers expressly given to the Governor, either by the Constitution or by statute, and there is not only no express power of suspending them given him, but a striking contrast is made between his powers in reference to military officers and those concerning civil officers.

\* \* \*

If the people of the State of Maryland, who framed the Constitution through their representatives and then by their votes ratified it, are to be judged by their actions, they have unmistakably declared that it is not their will that those occupying important public offices be deprived of them, merely because they are *charged* with incompetency or misconduct.

*Id.* at 79–80, 83–84, 78 A. 820.

 The Baltimore City Police Department is a State agency governed by the enactments of the General Assembly. The Mayor enjoys no inherent authority over the department or the office of Police Commissioner. The authority given to the Mayor in Article IV of the Charter to appoint municipal officers, and to remove officers "at pleasure," does not relate to the Police Commissioner. Both the Mayor's power of appointment and removal of the Police Commissioner are governed by PLL § 16–5.

The General Assembly did nothing more than transfer to the Mayor the same power of removal previously held by the Governor. *Compare* PLL § 16–5(e) (1969), *with* PLL § 16–5(e) (2005). Patently, the Mayor's authority to remove a Police Commissioner appointed pursuant to law is the same as that of the Governor's prior to 1976. Like the Governor, the Mayor may only remove the Commissioner "for official mis-

conduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers." PLL § 16–5(e) (2005).

 Article II, section 10 of the Constitution of Maryland empowers the Governor to "nominate, and, by and with the advice and consent of the Senate, appoint all civil and military officers of the State, whose appointment, or election, is not otherwise herein provided for, unless a different mode of appointment be prescribed by the Law creating the office." Article II, section 15 states that the Governor "may remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years." The Court of Appeals has stated that "[t]he term 'civil office,' " in Article II, "seems to be synonymous with 'public office' ". *Nesbitt v. Fallon*, 203 Md. 534, 544, 102 A.2d 284 (1954).

"It is well established that a position is held to be a public office when it has been created by law and casts upon the incumbent duties which are continuing in their nature and not occasional, and which call for the exercise of some portion of the sovereignty of the State. The most important characteristic of a public office, as distinguished from any other employment, is the fact that the incumbent is entrusted with a part of the sovereign power to exercise some of the functions of government for the benefit of the people."

*Id.* (quoting *Buchholtz*, 178 Md. at 283, 13 A.2d 348).

Maryland Code (1984, 2004 Repl.Vol.), § 3–307 of the State Government Article ("State Gov."), sets forth the manner in which the Governor may remove a civil officer. Section 3–307(a) states that the Governor may act upon "the filing of a complaint against a civil or military officer." The Governor is required to provide the officer with "a copy of the complaint," and "notice of the time when the Governor shall hear the complaint." State Gov. § 3–307(a)(1). The Governor is also authorized to compel the attendance of witnesses at the hearing, provide for payment of fees and expenses to witnesses, determine who must pay costs, and enforce any such orders. State Gov. § 3–307(a)–(b). Removal of a civil officer by the

Governor therefore requires, at a minimum, notice of the complaint against the officer and a hearing. It follows that the Mayor's power to remove a Police Commissioner under PLL § 16–5(e) is also limited to removal for cause, and requires notice of the cause and a hearing as provided for in the statute.

### B. Effect of the Employment Contract

Clark argues that, because the Mayor's power of removal is limited to removal for cause, the provision in the employment contract giving the Mayor the "right to terminate without cause" is unenforceable. In the alternative, he argues that the Mayor breached the contract by failing to provide sufficient notice of termination under the terms of the contract.

The Mayor asserts that the contract is unambiguous, valid, and enforceable, and that the City provided the requisite forty-five days' notice of termination.

■■■ We have said that, " '[a]s a general rule, parties are free to contract as they wish.' " *White v. Simard,* 152 Md.App. 229, 248, 831 A.2d 517 (2003), *aff'd,* 383 Md. 257, 859 A.2d 168 (2004) (quoting *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.,* 307 Md. 631, 643, 516 A.2d 586 (1986)). Nevertheless, " 'a contract conflicting with public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy.' " *Medex v. McCabe,* 372 Md. 28, 39, 811 A.2d 297 (2002) (quoting *McCabe v. Medex,* 141 Md.App. 558, 566, 786 A.2d 57 (2001)).

■■■ Section 2 of the MOU expressly provides that Clark could be removed by the Mayor in accordance with PLL § 16–5(e), and states that "nothing in this Agreement shall affect the rights of the Mayor in that respect." But, it then purports to define "just cause" differently than the statutory provisions, and in section 12, provides that "[e]ither party may terminate this contract at any time, by giving forty-five (45) days prior written notice to the other." Together, these provisions expand the Mayor's removal authority beyond that granted by the General Assembly. They are, therefore, invalid. As a

matter of law, the Mayor was not entitled to summary judgment based on the invalid terms of the MOU. To be sure, the appointment and removal of a Police Commissioner may be "peculiarly local in character," but the Police Commissioner is the head of a State agency. The Mayor's power of removal has been limited by the General Assembly. The appropriateness of this policy is a matter for the General Assembly, not this Court, to consider.

Under PLL § 16–5, the Police Commissioner may be involuntarily terminated by the Mayor only for cause as defined by PLL § 16–5(e).[8] This case involves an appointment subject to a written contract between the parties—a contract in which certain rights and obligations not contemplated by the Public Local Law were accepted by each party.[9] For example, in exchange for certain financial commitments made to the appointee, the City was not bound to a fixed term of years that it could shorten only for cause.

The City contends that some modification of the statutory terms of employment fixed by the statute was necessarily within the contemplation of the legislature and therefore within the authority of the parties to accomplish by contract. Whatever validity, if any, that argument may have with respect to other aspects of the MOU, it does not extend to the very basic elements of the term of office and grounds for removal from office. Everything in the history of this office and the actions of the General Assembly with respect thereto suggests that the State did not intend to authorize the City to assume the degree of control over the State's police agency that would flow from what is essentially a loss of tenure otherwise provided by statute.

---

8. PLL § 16–5(f) states: "In case of death, resignation, retirement, removal or disqualification of the Police Commissioner, the Mayor shall appoint a successor for the remainder of the term so vacated."

9. PLL § 16–5(b) states: "The Police Commissioner shall receive a salary as may be provided in the annual Ordinance of Estimates of Baltimore City, but in no event less than $25,000 per year." As noted, the MOU provided for a salary of $150,000.

Thus, the circuit court erred in holding as a matter of law that the entire contract between the parties was valid and enforceable. We shall therefore reverse and remand to the circuit court. On remand, the circuit court must consider the additional questions that have been raised by the City, including questions of waiver, estoppel, and damages.[10]

## JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR

---

**10.** The Mayor contends that Clark is barred from arguing that the MOU is unenforceable based on "familiar principles of estoppel or waiver," to the effect that "[a] party who, like Clark, accepts the benefits of a contract, cannot subsequently disavow the existence, validity or effect of the contract." Some courts have recognized an exception to the general rule, however, that "[w]here the contract is void as against public policy or against an express mandate of the law, a person who has accepted a benefit thereunder will not be estopped to defend against the contract when it is sought to be enforced against him." *McMullin v. McMullin*, 926 S.W.2d 108, 111 (Mo.Ct.App.1996) (quoting 31 C.J.S. Estoppel § 110). In *McGinley v. Massey*, 71 Md.App. 352, 361, 525 A.2d 1076 (1987), this Court stated that "[a] corporation cannot be estopped to set up illegality as a defense to an action on a contract." Moreover, whether a party who accepted benefits conferred by a contract is estopped from challenging the validity of the contract is a factual question that "necessarily depends on the particular circumstances of each case." *Faller v. Faller*, 247 Md. 631, 637, 233 A.2d 807 (1967). The circuit court did not consider estoppel and waiver in its grant of summary judgment.

The Mayor also urges us to affirm the circuit court's grant of summary judgment with respect to Clark's claim for monetary damages. Section 2.B. of the MOU states that, in the event Clark was terminated other than for just cause, forced to resign, had his salary reduced, or was not reappointed other than for just cause, he was to be paid "a lump sum payment, as and for additional compensation/severance, equal to six (6) months aggregate salary," along with compensation for accrued benefits. Section 2.B. further states: "Should Clark not be reappointed or terminated without just cause, Clark agrees that the additional compensation/severance lump sum payment set out above shall satisfy all obligations City has to Clark as a result of the termination/non-reappointment."

The Mayor argues that "Paragraph 2B of the contract is a valid and enforceable provision providing for limitation of liability and liquidated damages," and maintains that Clark has already been paid all the monetary damages to which he is entitled. Because the court ruled that section 12 of the MOU was valid and enforceable, and that Clark

PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.

---

had been properly terminated under that provision, it did not address whether section 2.B. limits Clark's claim for damages.